[S. F. No. 11316. In Bank.—February 1, 1926.]

RICHARD T. POMEROY, Executor, etc., Respondent, v. GEORGE D. COLLINS, Sr., et al., Appellants.

[1] TRUSTS — ACTION TO SET ASIDE — COMPETENCY OF TRUSTOR — EVI-DENCE—FINDINGS.—In this action in equity, brought by the executor of the estate of a decedent, to set aside and compel the cancellation and annulment of certain trust instruments executed by said decedent during his lifetime on the ground that, at the time he executed the same, the decedent was mentally incompetent and of unsound mind, there was sufficient evidence to fully sustain the findings of the trial court that the decedent was of unsound

mind at the time and for some time prior to the execution of the instruments in question to the extent that he did not understand the nature, purpose, or extent of his acts.

[2] ID.—CONTRACTS—WILLS—MENTAL CAPACITY REQUIRED.—No hard-and-fast rule may be announced as to whether a different degree of capacity is required to make a deed or contract than is necessary to the execution of a valid will. As a general proposition of law it is impossible to say that either requires a greater degree of capacity than the other, and each must be construed with reference to its own particular or peculiar facts.

[3] ID. — RIGHT OF RESCISSION — PARTIAL INCOMPETENCY. — To avail one's self of the statutory remedy prescribed by section 39 of the Civil Code, which provides that a "conveyance or other contract of a person of unsound mind, but not entirely without understanding, made before his incapacity has been judicially determined, is subject to rescission, as provided in the chapter on rescission," it is not necessary for a person to be incompetent to make any kind of a contract or to transact any business, however simple, but the test is: Was the party mentally competent to deal with the subject before him with a full understanding of his rights?

[4] ID. — MENTAL DEFICIENCY TO CONTRACT — EVIDENCE—FINDING — APPEAL.—If there is found in the evidence any rational ground for holding that the person executing a contract was mentally deficient, his contract will be avoided; and in determining this question an appellate court must regard the evidence in the light most favorable to such a conclusion.

[5] ID.—INTENT TO GAIN ADVANTAGE—FAIR TRANSACTION—BURDEN OF PROOF.—In an action in equity, brought by the executor of the estate of a decedent, to set aside and compel the cancellation and annulment of certain trust instruments executed by said decedent during his lifetime to defendant, the question of whether or not defendant intended and planned to gain an advantage over the decedent is a question of fact for the trial court, and if he did, then the burden is upon defendant to show that the transaction was fair.

[6] ID. — PERSON ASSUMING TO ACT AS ATTORNEY — LEGAL ACCOUNTABILITY — JUDICIAL KNOWLEDGE. — The supreme court will take judicial knowledge of the fact that a certain person was for many years an active, practicing attorney in all the courts of this state, notwithstanding his name does not at the time appear upon the roll of attorneys of this state; and where said person assumes to be a practicing attorney so far as his relations with another person

---

2. Capacity to contract as affected by mental conditions, note, 3 L. R. A. (N. S.) 174. See, also, 6 Cal. Jur. 32; 9 Cal. Jur. 117; 26 Cal. Jur. 630; 14 R. C. L. 583.

3. See 14 Cal. Jur. 337; 4 R. C. L. 503.

are concerned, he will be held to the duties and burdens which the law imposes upon an attorney in dealing with his client and to the same degree of accountability as though he were a legally admitted attorney.

[7] ID. — INIQUITOUS TRANSACTION — EQUITY — EVIDENCE — APPEAL. — Whether a transaction such as was sought to be set aside in this action in equity contains within itself the seeds of an iniquitous purpose is a question solely for the conscience of a chancellor and his decree will not be disturbed if there be any substantial evidence to support his conclusion, even though an opposing conclusion may find some support in conflicting or contradictory evidence.

[8] ID.—ACTION TO SET ASIDE TRUST AGREEMENTS—EQUITABLE JURISDICTION—RIGHT TO JURY.—Where the issue joined by the pleadings in an action in equity, brought by the executor of the estate of a decedent, to set aside and compel the cancellation and annulment of certain trust agreements, is clearly of equitable jurisdiction, the right to a jury trial does not exist as a matter of right; and in such a case it is not error to deny defendant's application for a jury trial.

[9] ID. — CANCELLATION OF INSTRUMENTS — RIGHT TO JURY — COMMON LAW.—Under the common law the right to a trial by jury was not granted in actions for the cancellation of instruments; and in this state it is not error to deny a jury in any cases where such right was not granted at common law.

---

(1) 9 C. J., p. 1256, n. 21; 39 Cyc., p. 92, n. 21 New. · (2) 32 C. J., p. 727, n. 36. (3) 32 C. J., p. 727, n. 36. (4) 4 C. J., p. 775, n. 26; 9 C. J., p. 1254, n. 3, p. 1272, n. 32. (5) 9 C. J., p. 1252, n. 79, p. 1258, n. 59 New. (6) 6 C. J., p. 570, n. 41 New; 23 C. J., p. 108, n. 75 New. (7) 4 C. J., p. 900, n. 98, 99; 9 C. J., p. 1272, n. 32. (8) 9 C. J., p. 1257, n. 42. (9) 9 C. J., p. 1257, n. 42; 35 C. J., p. 148, n. 9.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. Walter Perry Johnson, Judge. Affirmed.

The facts are stated in the opinion of the court.

George D. Collins, Sr., *in pro. per.*, and Daniel J. Kiley for Appellants.

---

8. Trial by jury in equity cases, note, 15 L. R. A. 287. See, also, 15 Cal. Jur. 331; 16 R. C. L. 209.
9. See 4 Cal. Jur. 795.

McNair & Stoker, William W. McNair and George E. Stoker for Respondent.

SEAWELL, J.—This is an action in equity, brought by the executor of the estate of Mathew Kelleher, deceased, to set aside and compel the cancellation and annulment of four certain trust instruments executed by said Mathew Kelleher, on the ground that said Mathew Kelleher was, at the time he executed the same, mentally incompetent and of unsound mind. It is claimed and alleged that the execution of said trust instruments were induced and procured by fraud and deceit practiced upon said Mathew Kelleher by appellant George D. Collins, Sr., whereby said Kelleher conveyed and transferred to said George D. Collins, Sr., as trustee, certificates representing 910 preferred shares of the capital stock of the Pacific Gas and Electric Company, a corporation, and certain described real property fronting on Folsom Street, city and county of San Francisco, of the aggregate value of not less than $85,000, all of said property being at the time of his death the property of said Mathew Kelleher, and constituting property belonging to his estate. The complainant also prayed for an order directing the said George D. Collins, Sr., to reconvey and retransfer said real property and stocks to the executor of the said estate. The trial court annulled said trust instruments and granted relief in accordance with the prayer of the complaint. The appeal taken by George D. Collins, Sr., is from the decree as thus rendered and is joined in by intervener, Helen H. Walsh. The other defendants not being beneficially interested in the result of the action did not join in the appeal.

The trust instruments will be identified in the order and by the same letter stamps that were placed upon them by the trial court. Exhibit "A" purports to be a "Declaration of Trust and Assignment of Stock," and bears date May 25, 1921. By its terms Mathew Kelleher assigned, transferred, and conveyed to "George D. Collins, Sr., as trustee, and upon the uses and trusts hereinafter specified, 910 preferred shares of the capital stock of the Pacific Gas and Electric Company, a corporation." A description of the stock is therein set out. The instrument bears the indorsement of and recites the delivery of said stock by said Kelleher to

said George D. Collins, Sr., as trustee. The next paragraphs are as follows:

"The said trustee to have and to hold said 910 shares of stock upon the express trust to pay the dividends thereon to said trustor until such stock is sold and to sell, assign, transfer and convey said stock or any part thereof to the purchaser or purchasers and to dispose of the proceeds of such sale or sales as follows, to-wit: To Helen H. Walsh, of West Summerville, Massachusetts; Mrs. Margaret O'Neil, of Boston, Massachusetts; Julia H. Pomeroy, Parish of Drischane, County Cork, Ireland; Patrick O'Reardon, Parish of Drischane, County Cork, Ireland; $1000 each.

"V.

"All reversionary interests in the proceeds of said sale of said shares of stock, resulting from the death of a beneficiary or other cause and the amount not herein before disposed of, shall vest in said *trustee pro se,* and *not in trust.* [Italics supplied.]

"In witness whereof, I have hereunto set my hand the day and year first above written.

"MATHEW KELLEHER.

"Witness:

"GEO. D. COLLINS, SR.

"I hereby accept the foregoing conveyances and trust for the purposes therein specified.

"Dated this 27th day of May, 1921.

"GEO. D. COLLINS, SR."

Exhibit "B" is a deed and declaration of trust executed May 26, 1921, whereby the Fulton Street real property is granted and conveyed to said George D. Collins, Sr., as trustee, "to have and hold in fee absolute upon the express trust nevertheless to sell and convey said property and to dispose of the proceeds" as follows: To pay all debts and the expenses of his last illness and funeral expenses; to pay to the Reverend Father McDonald, chaplain of the Holy Cross Cemetery, the sum of $250 for masses for the repose of his soul; to spend $500 for a monument to be erected at his grave and whatever sum may be necessary for perpetual care of the grave. The names of the same beneficiaries set out in exhibit "A" are restated and each is given an additional $1,000. The reversionary interest clause and the *"pro se,* and *not in trust"* clause are repeated. The execu-

tion is the same in form as the first instrument. It is dated May 26, 1921.

Exhibit "C" is a declaration of trust and an assignment of stock and precisely the same in substance and form as exhibit "A" except the *"pro se,* and *not in trust"* clause is omitted and in lieu thereof (after providing for the payment to the same beneficiaries named in the trust instruments bearing date May 25th and May 26th respectively) the following clause appears: "To dispose of the remaining amount of the proceeds of said sale in accordance with the *instructions heretofore given said trustee by said trustor."* [Italics supplied.] It contains a clause providing for the payment of debts and expenses which is not found in exhibit "A." The execution is the same as in the other trust instruments. It bears date May 27, 1921.

Exhibit "D" is a deed and declaration of trust and repeats the names of the beneficiaries and the amounts of the benevolences set out in the trust instrument marked exhibit "B," by giving to the Reverend Father McDonald an additional $250 for the saying of masses for the repose of his soul, and by setting aside an additional $500 for the erection of a monument at the grave, and by giving to Helen Walsh, Mrs. Margaret O'Neil, Mrs. Julia H. Pomeroy, and Patrick O'Reardon an additional $1,000 for the third time, making a total of $4,000 to each. It is precisely like the trust instrument marked exhibit "B" except the *"pro se,* and *not in trust"* clause is omitted, and like its companion instrument it directs the expenditure of the remaining amount "in accordance with the *instructions heretofore given said trustee by said trustor."* The execution is the same as the others and the day of execution is given as May 27, 1921.

The oral instructions which Mr. Collins claims were given to him by Kelleher on May 23, 1921, and which were afterward reduced to writing by Collins, were to be a guide for him in the distribution of the estate. According to Collins' testimony the oral instructions given by Kelleher contained directions which were not to be disclosed to Kelleher's friends or made public. These instructions purport to have been acknowledged by Collins before a notary public on May 26, 1921. Omitting the formal parts, the instructions as prepared read:

"And whereas on said 25th day of May, 1921, the said Matthew Kelleher transferred said shares of stock with the exception of the fourteen shares evidenced by certificate No. 32310 to the undersigned as trustee by endorsement on the certificates and delivery of said certificates so endorsed, and subsequently said fourteen shares were issued to the undersigned as such trustee by said corporation together with eight hundred and ninety-six shares, making a total of nine hundred and ten shares (first preferred) of the capital stock of said corporation, issued to the undersigned as trustee for said Matthew Kelleher.

"And whereas in the said declarations of trust certain property is transferred to the undersigned *pro se,* to wit: proceeds of sale therein mentioned, the declared purpose of said Kelleher in that respect being to avert litigation by persons claiming without right to be his heirs or relatives and in that behalf to secure to and confer upon the undersigned the absolute and uncontrolled and independent judgment and discretion free from interference or control by any court in · determining from evidence adduced who if any person or persons are the surviving heirs and relatives of said Matthew Kelleher and in selecting from such heirs and relatives the person or persons deemed by the undersigned worthy of having and receiving said property and proceeds, the said Matthew Kelleher stating that to the best of his knowledge and belief, all of his relatives are dead but that if nevertheless any of his relatives survive him, they were to receive said property in equal shares according to said selection by the undersigned, the said Mathew Kelleher further stating that he was never married;

"And whereas said Mathew Kelleher on said 25th day of May, 1921, instructed the undersigned to dispose of and distribute said property to wit: said proceeds to the following persons and to the hereinafter named charitable organization in the proportions and upon the contingencies hereinafter stated, Now therefore I do hereby formally acknowledge and declare that the said property and proceeds conveyed to me *pro se,* by said Matthew Kelleher in each of said declarations of trust, were so conveyed to me upon the following instructions given to me by said Matthew Kelleher on said 25th day of May, 1921, to wit:

"I.

"To make final and conclusive determination from evidence adduced as to who if any are the heirs and surviving relatives of said Mathew Kelleher and thereupon to select from such heirs and relatives those worthy of having and receiving said property and proceeds, and distribute the same to them in equal shares. That should there be but one person so selected as herein stated, to distribute to such person all said property and proceeds.

"II.

"If there be no surviving relatives or heirs of said Matthew Kelleher, or none deemed by the undersigned worthy of having and receiving said property and proceeds, then to distribute said property and proceeds as follows, viz.: one-third thereof to Helen H. Walsh, Julia H. Pomeroy, and Patrick O'Reardon in equal shares, and the remaining two-thirds to be given equally to the Associated Charities of San Francisco for the charitable purposes of the organization, and to the relief of those of the Irish belligerents made destitute in County Cork, Ireland, in consequence of supporting the Sinn Fein warfare now prevailing there.

"III.

"Any residue of the said property and proceeds arising from the death of either said Helen H. Walsh, Julia H. Pomeroy or Patrick O'Reardon prior to distribution to them as hereinbefore stated, shall be paid and transferred by the undersigned to the survivor or survivors, and if none, then said residue shall be paid one-half to said Associated Charities of San Francisco for the charitable purposes of the organization and the remaining one-half shall be paid to those of the Irish belligerents made destitute in County Cork, Ireland, in consequence of supporting the Sinn Fein warfare now prevailing there.

"IV.

"I do hereby accordingly undertake and agree to comply strictly with the foregoing instructions given me by said Matthew Kellcher on said 25th day of May, 1921.

"In witness whereof I have hereunto set my hand this the 26th day of May, 1921.

"(Signed)     GEO. D. COLLINS, SR."

Mathew Kelleher died June 18, 1921, a little more than three weeks after the execution of the foregoing trust instruments.

The second amended and supplemental complaint contains three counts or causes of actions, the gravamen of each count being the practice and imposition of fraud and deceit in several forms by the defendant Collins upon said Mathew Kelleher, thereby inducing and influencing him to execute said instruments. The first count alleges unsoundness of mind on the part of said Mathew Kelleher and consequently the execution of said instruments by him was not his voluntary act; also that he lacked the mental capacity to understand the nature, purposes, and effect of said acts. That it was not the intention of said Mathew Kelleher to transfer the whole or any part of his estate to said George D. Collins, Sr., as trustee or otherwise.

The second count alleges the age of Mathew Kelleher at the time of the execution of said instruments to have been about seventy-nine years and that he was and for a long time prior thereto had been suffering from disease, loss of memory, and weakness of body and mind to the extent that he was unable to properly care for his property or affairs, and was at the time of the execution of the said instruments and for a long time prior thereto had been in a weakened and impaired condition of mind and body and was easily influenced by his acquaintances and by those in whom he reposed confidence. That said Collins was an attorney at law and maintained offices in the city and county of San Francisco. That Kelleher reposed absolute faith and confidence in said Collins and counseled with him with the intention and desire of making a testamentary disposition of his estate by will, but that said Collins advised, counseled, and cautioned said Kelleher, who was in a weakened and enfeebled mental condition, against making a will and persuaded him that he, Collins, better than the courts of law and better than he, Kelleher, was able to determine who were his surviving heirs and relatives, and the extent, if any, to which said heirs or relatives were deserving of his bounty, and promised said Kelleher that if he signed said instruments and transferred to him the said estate, that upon the death of said Kelleher he would make such a determination and would distribute his estate according to the merits of

the respective claimants as set out in said instructions. That by the adoption of such a plan all litigation commenced by persons claiming, without right, to be his heirs or relatives would be averted. It is also alleged by said count two that Kelleher did not know that he was absolutely divesting himself of his estate by the execution of said instruments, A and B, and did not know that he was empowering said Collins to sell and convey the same before as well as after his death and to receive the purchase price thereof without any obligation resting upon said Collins for the support and maintenance of said Kelleher during the remainder of his life or to account to any person for any portion of said estate over and above the sum of about $10,000, as provided in said trust instruments A and B. It is directly alleged that the fact that Kelleher was absolutely divesting himself of all interest in and to his property was concealed from him and that he was without sufficient understanding to protect himself against the machinations of Collins, whose purpose and intention it was to appropriate all of said estate to himself above the said sum of $10,000, which amount was, according to the terms of said instruments, made payable to said beneficiaries. It was the theory of plaintiff, as pleaded in said count two, that if successful in maintaining said trust instruments A and B, it was the purpose and intention of said Collins to suppress trust instruments C and D, but if the first plan should by any chance miscarry, he would in such event dispose of the remainder of Kelleher's estate as provided by the instructions referred to in paragraph VI of C and paragraph III of D, which authorized him to dispose of said property "in accordance with the instructions heretofore given said trustee by said trustor," which were orally given and resided in the breast of Collins alone. Further, that the reduction of said instructions to writing was an afterthought and was compelled by the exigencies of a desperate situation, and was done only to give a fairer aspect to an inequitable transaction. The allegation that it was the intention of Collins to hold under cover the second set of instruments, C and D, until and unless required by some untoward circumstance to produce them, is based upon the fact that he hastened to file at once said trust instruments A and B for record in the office of the county recorder of the city and county of San Francisco, but did not make

known the existence of said instruments C and D and said instructions until some days thereafter. Other allegations of fraudulent acts are alleged, but it is not necessary to repeat them. Count three alleges mental incapacity on the part of Kelleher and alleges that George D. Collins, Sr., was practicing law and maintained offices in the city and county of San Francisco and that Kelleher in his mentally incapacitated condition took advice from him as an attorney and was deceived into the execution of said trust instruments. It it further re-alleged that Kelleher consulted Collins with the intention of making his last will and informed said Collins that he desired to make a will in favor of a number of his relatives and intimate friends and requested Collins to prepare such a will for execution, and when he affixed his name to said instruments he believed it was in execution of a will prepared in accordance with his request and desire, and that the instruments which were actually signed by him were represented to be in accordance with the will, wish and desire of the said Kelleher, but that he was acting under a misrepresentation of facts when he executed said instruments; that he had confidence in said Collins and relied upon him implicitly to carry out his wishes, and that he had no independent advice in the matter whatsoever, but acted solely and alone under the advice and influence of the said George D. Collins, Sr.

The answer specifically denies each allegation of fraud and alleges that said Mathew Kelleher at and during all the times related therein was of sound and disposing mind and was free from any incapacity of any kind whatsoever, and that said instruments and transfers were prepared by the defendant in strict accordance and compliance with the express wishes, desires, and instructions of said Kelleher and not otherwise. That at all times he was of sound and disposing mind and acted freely and voluntarily in the exercise of his own will and judgment. It is denied that it was the purpose or the intention of said Kelleher or desire of said Kelleher to make a will, but that it was his effort to avoid probate proceedings and that the trust instruments were the product solely of the mind of said Kelleher and not of the said Collins. Defendant Collins disclaims any and all and every right, title, and interest, other than as trustee, in and to the real and personal property or any part thereof. His

prayer is that such trust instruments be upheld, joined in by Helen H. Walsh, an intervener.

The court found that each of the said instruments was executed by the said Mathew Kelleher without receiving any consideration therefor and that in the month of May, 1921, he was of the age of about seventy-nine years and for a long time prior to the execution of said trust instruments was physically infirm and his mental capacity was greatly impaired; that he was at all times of unsound mind; that because of such unsoundness of mind he was unable to understand, and did not understand, the nature, purpose, and effect of the said acts, or either thereof, in indorsing and delivering to said defendant the aforesaid certificates of stock and in executing and delivering to said defendant the aforesaid instruments in writing; that at none of said times did the said Mathew Kelleher possess sufficient mental capacity to perform or understand his acts or either thereof; that from the time of the execution of said instruments until his death, to wit, June 18, 1921, the impairment of the physical and mental capacities of the said Mathew Kelleher continuously increased; that the said George D. Collins, Sr., was aware of the mental condition of said Mathew Kelleher and knew at the time said Kelleher executed said instruments that he did not understand or comprehend the effects of said acts or either of them. It is further found that the said Mathew Kelleher did not on the twenty-fifth or twenty-sixth or twenty-seventh days of May, 1921, or any other time, intend to transfer, assign, or convey his estate, or any part thereof, to said George D. Collins, Sr., either individually or as a trustee for himself or for any other person or at all; that the said George D. Collins, Sr., well knew on the said twenty-fifth, twenty-sixth and twenty-seventh days of May, 1921, that said Mathew Kelleher did not intend to transfer the whole or any part of his estate to said defendant, either individually or as a trustee. It was specifically found by the court that all of the allegations of the first count of the second amended and supplemental complaint were true and sustained by the evidence. No finding was made as to the other two counts, as the finding on the first count made it unnecessary to find on the other two. Both are more or less interwoven with allegations of mental incompetency and the results that may flow therefrom. No

point is made because of a failure to find on the other two counts.

It may be said at the outset that a consideration of the contents of the four trust instruments and said instructions, and the manner in which they were prepared and produced, without recourse to any evidence whatever as to the mental competency of the person who executed them, would be a sufficient reason for a court of equity to scrutinize the transactions with great care and concern.

The early story of the life of Mathew Kelleher is told by Bartholomew Danehy, his lifelong associate and intimate friend, to whom he bequeathed $5,000 in his will dated February 9, 1914. Both were born in County Cork, Ireland, were about the same age, lived but three blocks apart, and were boys together in youth and companions throughout their long spans of life. Kelleher preceded Danehy by four years in arriving at Boston. In 1872 Danehy also left Ireland and came to Boston. For a time he and the companion of his youth lived in the same house conducted by Mrs. O'Neil, who is mentioned as one of the beneficiaries in the trust instruments. Danehy and Kelleher came to California together in 1875 and both located in the city and county of San Francisco. Kelleher engaged in the house-moving business, was a man of strong physical powers and possessed good intellect. He took care of his savings and invested them in sound securities. His habits of life were methodical and fixed, but very simple. He was cautious and very suspicious. He enjoyed his friends, however, and the associations of his boyhood and early life in Ireland seemed to have lingered in his memory up to a short time prior to his death. He never married and spent at least the later years of his life at a hotel. He associated with friends of his nationality, whose companionship he delighted in. By observing strict rules of frugality he slowly accumulated the property involved in this proceeding. George D. Collins, Sr., described Mathew Kelleher as a "miserly" person, possessing a very suspicious mind, "very illiterate, very uncouth, but very intelligent." As he formerly knew him, he described him as a vigorous, healthy man, apparently very strong. He said he was always "very opinionated," and intelligent in his judgment—"a man of very strong mind at that time. . . . There seemed to be in his mental makeup a rather sinister

turn.'' Later, when he saw him, he described him as ''having acquired a very much more positive frame of mind than formerly, and he seemed to be in a quarrel constantly with conditions and people. He had a prejudice against lawyers and would not pay them if he could avoid it.'' His suspicious mind did not change with the passing years. It is the testimony of all who knew Kelleher in his better days that he was a strong-willed man, independent, self-reliant, and conscious of his ability to make his way in the world. George D. Collins, Sr., testified that he met Kelleher for the first time about twenty-five years ago. He saw him but occasionally up to about 1909, and from 1909 to 1918 he was out of touch with him entirely. Kelleher visited Ireland in 1910 and returned to San Francisco in 1914. He made a will before leaving this country for Ireland in 1910, and made another before leaving Ireland for this country in 1914. Collins had no intimate relations with him nor did he know that Kelleher had spent four years of his life in Ireland since he last saw him or that he had ever executed a will. The only law business that Collins seemed to have transacted for him was in his later years, beginning with an incident when Kelleher became embroiled with a neighbor whom he claimed had dumped some rubbish containing nails and glass upon his vacant lot. Kelleher took the matter up with the person who was alleged to have dumped the rubbish on his lot and it resulted in Collins swearing to a complaint charging the alleged wrongdoer with an offense under the city ordinance. This difficulty was of trifling nature, but it wrought upon Kelleher very much. He grew to believe that people were pasturing animals upon his lot at unusual hours and said animals were eating the wild grasses growing thereon. He was seen by the neighbors at unseemly hours secreting himself in places of vantage that he might discover the trespassers. He became involved in a turmoil concerning these inconsequential matters. These matters were regarded by the neighborhood as trifling and foolish and they were not inclined to discuss the subject with him. It was within this period that Kelleher's conduct, conversation, and general manner began to attract the attention of the neighbors and of his intimate friends and plainly marked the beginning of his mental decay. Kelleher's most intimate friends did not know that Collins represented him or was

his attorney; in fact, they were not acquainted with Collins until the beginning of the transactions in question, when they chanced to see him in Kelleher's room a day or two before the execution of said instruments going through his trunk for the purpose of obtaining certain data. The trunk contained letters and papers of personal importance to Kelleher, and it furnished the basis of much, if not all, of the history related by Collins concerning a knowledge of Kelleher's private life. It appears that Kelleher had, on previous occasions, conferred with attorneys other than appellant on matters of business.

As to the findings of the court that Kelleher was of unsound mind and was not able to understand the effect of the instruments which he executed there is an abundance of evidence in the record. As early as February 10, 1917, four years prior to his detention for the second time at the Lane Hospital, we find the following entry upon the clinical record: "Eyes: pupils small, reacts sluggishly. . . . Marked arcus senilis." Also the following statement made by him upon his entry to the hospital on that occasion: "I am crazy. I cannot sleep. From my throat up is all bad. Is a tube running down from my skull which carries the pain around?" He then complained of "buzzing" in the ears. He was dizzy and believed that "One of his lungs had gone out of him entirely." It was difficult to get his history because of his mental condition and deafness. He remained there only a short time and departed. Since that time he exhibited upon numerous occasions definite symptoms of both physical and mental decay or what is ordinarily known as senile dementia. Everyone who knew him well noted his mental and physical decline. Several persons who regarded and respected him testified that they would avoid trying to converse with him because of his constant mumbling and incoherent speech. He was very garrulous. His conversation with Mr. Collins but a day or two before he executed the instruments in question was alone enough to put him on notice as to Kelleher's mental condition. Mr. Collins' statement is that in discussing the disposition of Kelleher's estate with him he told him that he wanted a part of it invested in munitions of war to be sent to Ireland to aid the Sinn Fein cause. He also wanted to do something to Lloyd George that would mean his extermination.

In a letter written to him late in 1920 he said that if ''they could get Lloyd George it would accomplish more than all the night raids they can make.''

But this is not all. By a great preponderance of the evidence it would not seem possible that Kelleher could have appeared to anyone who undertook to carry on a conversation of any length with him to have been a rational person on May 25th, 26th, and 27th, or at any period thereafter.

In February, 1921, Kelleher re-entered the Leland Stanford or Lane Hospital. Doctor George H. Becker, a student interne at the Lane Hospital when Kelleher was admitted in February, 1921, and who was specializing in nervous disorders, had Kelleher under observation. Kelleher had intentionally taken boracic acid internally which had been given him to be used for a chronic ear trouble, believing that if it was efficacious externally it should be helpful if taken internally, and said it had burned a hole through his stomach, and complained that the medicine which the nurse had given him was poison. Physically he presented the findings of an agitated man with the usual deterioration found in such a case. He had muscular weakness, senile tremor, and incoordination of his muscular movements as the result of senility. There was present a marked arteriosclerosis (hardening and thickening of the arteries) and enlargement of the heart. Also diabetes, chronic bronchitis, and emphysematous, a swelling produced by gas or air diffused in the cellular tissue. The witness defined senile dementia to be a breaking down or failing of the intellect as evidenced by lack of ability to judge facts, loss of memory, particularly for recent dates, tendency to unreasonable conclusions. Arteriosclerosis dementia is manifested by loss of memory, a tendency to forgetfulness, repetition, irritability, periods of amnesia. The witness was of the opinion that Mathew Kelleher in February, 1921, was suffering from senile psychosis, or dementia. The clinic record showed under date of February 15, 1921, that he was afflicted with diabetes. His case was diagnosed as ''psychosis senile.'' Wandering of the mind, sleeplessness, restlessness, and incoherency are frequent annotations made in the neurological records or charts. Kelleher had hallucinations and illusions of a most pronounced character. He complained of pains in the head, which he attributed to an injury he had received some years

prior to his entry into the hospital. He imagined that his "wish-bone" was standing up at right angles and was standing out as much as an inch. He said that he applied some cold cream to the "wish-bone" and it seemed to drink it in like a fish. At no time does the neurological record show that Kelleher's mind was entirely normal or free from delusions of some form. While the mental cloudiness may have subsided or cleared up at times, and he became better oriented on some occasions than on others, there was no time when he was free from indulging in absurd notions. Another entry in the record states that upon an examination of Kelleher no definite symptoms of mental or nervous diseases were discovered, the conclusion being, however, that he was suffering from diabetes and possibly a senile psychosis.

The testimony of George D. Collins, Sr., was to the effect that Kelleher began to consult him as to making trust dispositions of his property some time in February, 1921, but nothing of a definite nature was done until about the twenty-third day of May, 1921. The active negotiations were then begun by Kelleher going to Collins' office and by Collins visiting Kelleher at his home in the Mission Hotel. None of the papers in question were executed before the twenty-sixth day of May, 1921. Before this day, however, a number of witnesses detailed a long list of mental lapses on the part of Kelleher, beginning with several months prior to his death. He was prone to fall asleep in his chair, and was given to incessant mumbling, was incoherent in his speech, forgetful and listless, and the continuity of thought was broken. He had not engaged in any business for a long time prior to the time in question and had done by force of habit the simple things which he continued to do until the beginning of the illness which resulted in death. The one desire that was firmly fixed in his mind and which was the last to perish was the desire to accumulate money. His only business was to draw the premiums on his stock, which were paid quarterly, and he appeared very regularly to receive them.

Charles L. Barrett, assistant secretary of the Pacific Gas and Electric Company, who had known Kelleher since 1914, and negotiated with him in the purchase of his first stock in said company, gives a vivid picture of Kelleher as he appeared a short time before and at the time he began to dispose of his estate. He met him every time he called to

draw his dividends and to reinvest the earnings in the pur-
chase of other stock. He had talked with him a great deal
about his personal and business affairs and was well ac-
quainted with him. He visited the office of the Pacific Gas
and Electric Company on May 20, 1921, as was his habit
every three months, to reinvest his earnings in the purchase
of more stock. He was very much emaciated, and wandering
in his talk. He was weak and had all he could do to get
into the office. His appearance shocked Mr. Barrett. He
muttered and his talk was more or less incoherent. It was
with great difficulty that Mr. Barrett could understand that
he wished a check which he had in his possession redrawn
and divided into two checks, one to be used for the amount
of stock he wished to purchase and the other for the balance,
to wit, $252.47. The latter check was returned to him. He
could not understand the transaction. He thought he should
still have two checks after he delivered one for the purchase
of the stock. Mr. Barrett could not explain the matter so
that he understood it. He returned on May 23d and ap-
peared to be very much troubled and said he wanted the
two checks. Barrett was unable to make him understand
the situation. Kelleher was usually quick to understand
business transactions when he was in health.

On the morning of May 26th, when Mr. Barrett arrived
at his office, he found Kelleher there sitting in a chair in
the worst chill, as the witness described it, that he had
ever seen a person have. He was actually shaking the chair.
When he was able to speak he asked about the checks. He
insisted that he saw the checks on one of the clerk's desks,
which was not true. He searched through his clothing, but
could not find the check he should have had, and he seemed
to have the idea that someone was trying "to do him up."
This check was given to him on May 20th, and was for
$252.47, and was indorsed by him in a very "shaky" hand,
and he took it with him. Later it was cashed by George D.
Collins, Sr. His appearance and mumbling to himself on
May 20th indicated that he was not his former self. On
May 26th Mr. Barrett could understand but a few of Mr.
Kelleher's utterances. The "terrific chill," as it was de-
scribed, lasted spasmodically throughout the entire time that
Kelleher was at the office, and when it was at its height he
was very weak. The severe shaking spoken of by the wit-

ness was doubtless a fit or seizure known as "senile tremor" which appears in the clinic report of his case made in February, 1921. Mr. Barrett put him on a street-car and advised him to go home. He did not reach his home, but subsequently fell in a faint or fit and was taken to the Emergency Hospital. Mr. Barrett was of the opinion that Kelleher was of unsound mind. He noticed that Kelleher began to fail in November, 1920, after he had drunk boracic acid as above related.

Mr. Collins testified that the first trust instrument, exhibit "A," was prepared May 25th, and that Kelleher was to call at his office to sign it, but failed to appear, and later telephoned to him to come to his room. He went to Kelleher's room that night and procured Kelleher's signature. No one but Collins was present to witness the signing. Its execution was afterward acknowledged by Collins as a subscribing witness. Instrument B, conveying the real property, was not signed on that night, as Kelleher, according to Collins, discovered an error in the description which he wished corrected and an appointment was made for Kelleher to be at Collins' office to sign the instrument as corrected on the morning of May 26th. That was the morning that Kelleher appeared at the Pacific Gas and Electric Company's office. His manner and appearance have already been described by Mr. Barrett. Collins heard of the collapse of Kelleher and hastened to the Emergency Hospital, taking with him the trust instrument covering the real property and had it signed by Kelleher. Collins testified that Kelleher's mind was perfectly clear when he arrived at the hospital and at the time he executed said instrument, and purported to relate parts of conversations he claims to have carried on with him. He found Kelleher on a reclining chair.

John T. Kane, who was an applicant for letters of guardianship of the estate and person of Kelleher, a matter pending, upon being informed of Kelleher's illness, procured an ambulance and went to the place where Kelleher was stricken, to convey him to the Emergency Hospital. He found him in a helpless condition and unable to walk. He testified: "He acted kind of childish as if he didn't have any sense. He seemed kind of stunned. I spoke to him and asked how he felt; he shook his head, 'no.'" From the time Kane first saw him until the time that Collins arrived at the hos-

pital, Kelleher did not utter a word. Collins said to him,
"You were to be down to my office this morning." Kelleher
said nothing, but "laughed like, kind of a funny grin."
He was raised to a sitting posture and Mr. Collins pulled
two papers out of his pocket and handed Kelleher a pencil
and said, "Sign here." Kelleher signed, Collins holding
the tablet. The papers were not read to him. Collins said,
"This is the paper you wished to sign at my office." Kelle-
her said nothing when he signed. The witness could not
say whether Kelleher recognized the paper or not. When he
signed his name extended beyond the edge of the instrument
he was signing. Prior and subsequent acts indicating irra-
tionality were also detailed. Reverend Thomas H. Flaherty
was present also when exhibit "A" was signed. His ver-
sion is that Mr. Collins said, "Here are those papers." His
recollection was that Kelleher made no reply. Kelleher
started to sign on a piece of yellow paper at the top. Collins
interrupted by saying, "Don't sign there, sign here," and
indicated with his hand. Kelleher made no reply. After
he signed the pencil dropped from his hand. Kelleher ap-
peared listless and "had something of a snarl on his face,
sort of a contraction of his face, and every once in a while
he would squint and look up with what seemed to be a
perfectly clear eye." That the witness did not believe
Kelleher to be in a normal mental condition is made clear
by an examination of his testimony. Two other instruments
were signed by Kelleher on May 27th, no one else being
present but himself and Collins. Father Flaherty had
Kelleher taken to a private room, where they were together
for forty-five minutes. What was said by either was not
divulged. At any rate, at the conclusion, Father Flaherty
suggested to those in charge that Kelleher be taken to St.
Mary's and a priest be procured for him there. Reverend
Patrick G. Foote was the priest called upon to hear Kelleher's
confession at St. Mary's. By Kelleher's words and actions
he said he appeared to him to be rational. He heard his
confession and gave him absolution. Asked as to what
Kelleher said, the father replied: "That is pretty hard to
say. I will have to explain myself. I wish to say the man
was a perfect stranger to me. He came into my life for
that once, and it would be pretty hard for me to give you
my memory of it. If it had been a case I had been visit-

ing for several weeks, I would have been able to tell you more or less what I said on those occasions. . . . '' When asked how long he was in Kelleher's room, he said: ''I came in and heard his confession and left his room and never met him again.'' He was not able to recall any conversation he had with Kelleher prior to the confession. Upon being asked pointedly whether he regarded Kelleher then being of sound mind, he replied: ''I judged him fit to make his confession. Q. But whether or not he was of sound mind or unsound mind? A. That would be supposed. Q. That he was of sound mind? A. Of sound mind.'' The other exhibits, ''C'' and ''D,'' were executed at St. Mary's Hospital on the twenty-seventh day of May, no one being present but Collins and Kelleher. Kelleher was removed from the Emergency Hospital to St. Mary's on the twenty-sixth day of May and remained at St. Mary's until the time of his death. For the first two days of his detention at St. Mary's Hospital female nurses were assigned to his case, but he grew so noisy and violent that they were replaced by male nurses. The first nurse went on duty at 7 P. M., May 26, 1921. At 11 o'clock that night he became very irrational and continued irrational all the time she was with him. He did not know where he was, and thought his room was on fire, and imagined that people were trying to steal his money. His mind was wandering and he had to be kept in bed by force. The day nurse went on duty at 7 o'clock the following morning and she had great difficulty in keeping Kelleher in his room. He was in a delirium all day and talked irrationally. He grew so violent that she and her companion were displaced by male nurses. It became necessary to change his room to a basement room and to confine him in bed with straps. It was impossible to carry on a rational conversation with him at any time. He had hallucinations and delusions, and mumbled continually. At times he would make a great deal of noise by shouting, and he imagined that he saw serpents and tarantulas upon the ceiling. There is evidence in the record given by attending nurses that he tore his bedding apart and cut the sheets into strips. He was also fearful that he was going to be served by a constable with a subpoena or some sort of process. He believed that persons who came about his room were there for the purpose of robbing him and people were trying to

enter his room through the transom. His temperature was usually normal. He was in a delirium much of the time, however, and it is the testimony of four or five nurses who attended him from the day he was brought to the hospital until his death that at no time was he a rational man. It was during this period of delirium and irrationality as described by a number of witnesses that Kelleher signed three of the instruments in question and during which period a power of attorney authorizing the transfer of fourteen shares of the Pacific Gas and Electric Company's stock to Collins was also brought to the hospital by Collins to be signed by Kelleher. Walter R. Gerard, who nursed Kelleher at St. Mary's beginning with May 29th to the time of his death, testified that there was not a day within that period that Kelleher did not have hallucinations and delusions. He also recited an attempt he made, at the request of Collins, to have Kelleher copy in his own hand a request prepared and furnished by Collins requesting that the latter act for him as his attorney in the guardianship matter then pending. He further testified that he was requested by Collins to make an affidavit that Kelleher seemed mentally right and to permit no one to see Kelleher, as an attempt might be made to induce him to make a will.

Upon the death of Mr. Kelleher, Doctor G. Y. Rusk, a pathologist of the University of California Hospital, and an assistant professor in the medical school, made an autopsical examination of the abdominal cavity and found the heart, kidneys, pancreas, and lungs in a very advanced stage of deterioration and disease. There was evidence of marked thickening and hardening of the arteries, fibrosis and sclerosis. The heart was generally enlarged and the surface in some instances had adhered to the sac in which it lies. Extensive fibrous myocarditis of the left ventricle was evident. The general condition of these organs was chronic and of long standing and affected in a very large degree the flow of the blood to the brain. The deceased suffered from a "heart block" which was a serious and chronic disturbance of the heart action in that it showed that the auricle and ventricle did not beat in normal rhythm. This was sufficient to cause loss of memory, forgetfulness, irritability, syncope, and a general mental disturbance. No autopsical examination was made of the brain. It was the

opinion of the expert that an examination of the brain would have shown the same condition as to arterial thickening and hardening as was disclosed by the examination of the organs of the body.

In addition to what has been above said, there is testimony in the record of marked general deterioration of mind and body in Kelleher beginning several years prior to his death. **[1]** We think there is no doubt but that there is sufficient evidence in the record to fully sustain the findings of the court that he was of unsound mind at the time of and for some time prior to the executions of the instruments in question to the extent that he did not understand the nature, purpose, or extent of his acts. There is also testimony in the record coming from his most intimate friends that during the time covered by the Collins' negotiations, he believed that he was engaged in making a will, and he remarked to one or two of his close friends that he had remembered them in his will. The finding of the court that he did not understand or appreciate the nature, quality, purpose, effect, and extent of his act in executing the papers in question is amply supported by the evidence in the case. It is the contention of appellant that had decedent made a will the evidence as adduced in this action would be insufficient to overturn it under the many standard authorities of this state settling the rule as to the degree of mental incompetency necessary to be adduced to justify a court or jury in holding a testator incompetent to make a will, and the same evidence if applied to such a case would compel us to hold it insufficient to establish mental incapacity. With this suggestion we must disagree. We feel satisfied that a finding of the court or a jury as to the incapacity of a testator upon evidence such as is presented to us in the instant case would compel an affirmance of the finding. **[2]** No hard-and-fast rule may be announced as to whether a different degree of capacity is required to make a deed or contract than is necessary to the execution of a valid will. A contract may be so complex and intricate as to require a keener discernment of intellect and understanding than would be required to execute an ordinary, simple will. And *vice versa.* As a general proposition of law it is impossible to say that either requires a greater degree of capacity than the other. Each must be construed with reference to its own particular

or peculiar facts. But this case is not to be ruled solely by the decisions of this state which establish the *quantum* of capacity required to transmit property by will. [3] Section 39 of the Civil Code provides: "A conveyance or other contract of a person of unsound mind, but not entirely without understanding, made before his incapacity has been judicially determined, is subject to rescission, as provided in the chapter on rescission of this code." Consequently, to avail one's self of this statutory remedy it has been said by the courts of this state and other jurisdictions that "it is not necessary for a person to be incompetent to make any kind of a contract or to transact any business, however simple, but the test is: Was the party mentally competent to deal with the subject before him *with a full understanding of his rights?* (*Union Pacific Ry. Co.* v. *Harris,* 158 U. S. 326 [39 L. Ed. 1003, 15 Sup. Ct. Rep. 843, see, also, Rose's U. S. Notes].) Did he understand the nature, purpose, and effect of the contract?" (*Carr* v. *Sacramento Clay Products Co.,* 35 Cal. App. 439 [170 Pac. 446].) [Italics supplied.] [4] After citing a number of authorities the decision states the rule that if there is found in the evidence any rational ground for holding that the person executing a contract was mentally deficient, his contract will be avoided. In determining this question an appellate court must regard the evidence in the light most favorable to such a conclusion. A person may understand that he is executing a mortgage and note or a trust deed, or trust instrument, and still lack sufficient capacity to realize the effect it might have on him or his estate and to judge of the wisdom or unwisdom of the transaction and its effect on his property. (*Sutcliffe* v. *Heatley,* 232 Mass. 231 [122 N. E. 317].)

Section 2224 of the Civil Code provides: "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." [5] Whether or not Collins intended and planned to gain an advantage over Kelleher was a question for the trial court. If he did, then the burden was upon him to show that the transaction was fair. [6] While the name of the appellant does not appear upon the roll of attorneys of this state, this court will take

judicial knowledge of the fact that he was for many years an active, practicing attorney in all of the courts of this state. That he assumed to be a practicing attorney so far as relations with Kelleher were concerned, there can be no reasonable doubt. Therefore, he will be held to the duties and burdens which the law imposes upon an attorney in dealing with his client and to the same degree of accountability as though he were a legally admitted attorney. He brings himself within the rule announced in *Clark* v. *Millsap,* 197 Cal. 765 [242 Pac. 918].

[7] Surely, a transaction such as has been outlined should command the close scrutiny of a chancellor. Whether the transactions contain within themselves the seeds of an iniquitous purpose is a question solely for his conscience, and his decree will not be disturbed if there be any substantial evidence to support his conclusion, even though an opposing conclusion may find some support in conflicting or contradictory evidence. We have examined the entire record and have given careful consideration to the arguments of counsel, and are convinced that the judgment is supported by the evidence.

[8] Appellant insists that the action is one primarily for the reconveyance of specific real and personal property in the possession of the appellant and that the action is, therefore, of a legal cognizance, and that the appellant was entitled to the intervention of a jury under the authority of section 592 of the Code of Civil Procedure. (*Donahue* v. *Meister,* 88 Cal. 121 [22 Am. St. Rep. 283, 25 Pac. 1096]; *Hughes* v. *Dunlap,* 91 Cal. 385 [27 Pac. 642].) But where the issue joined by the pleadings is clearly of equitable jurisdiction, the right to a jury trial does not exist as a matter of right. In such cases it is not error to deny the application for a jury trial. [9] Under the common law the right to a trial by jury was not granted in actions for cancellations of instruments, and the rule is well established in this state that it is not error to deny a jury in any cases where such right was not granted at common law. (*Holland* v. *Kelly,* 177 Cal. 43 [169 Pac. 1000]; *Cassidy* v. *Sullivan,* 64 Cal. 266 [28 Pac. 234]; *Woods* v. *Varnum,* 85 Cal. 639 [24 Pac. 843]; *Ballou* v. *Avery,* 175 Cal. 641 [166 Pac. 1003]; 15 Cal. Jur. 331.) It has been held that in actions which are nominally instituted to quiet title under section 738 of the Code

of Civil Procedure, but which are actions of a legal nature, such as the right to the possession of real property, the litigants are entitled to a trial by jury, but in the instant case, the gravamen of the complaint is of an equitable nature, and the trial court did not err in denying the application for a trial by jury. We recently held in the case of *Union Mutual Life Ins. Co. v. Broderick*, 196 Cal. 497 [238 Pac. 1034], that in an action of interpleader between two rival claimants to the proceeds of an insurance policy, neither was entitled to a jury trial, notwithstanding the circumstance that the real controversy was one of law. We hold, therefore, that no error was committed by denying a jury trial in the instant case.

The judgment appealed from is affirmed.

Richards, J., Shenk, J., Lawlor, J., and Waste, C. J., concurred.

Rehearing denied.