G. Maud Lovell, as Committee of the Person and Property of Hilda Davis Owsley, an Incompetent Person, Plaintiff, *v.* A. R. Keller and Others, Defendants.

City Court of New York, New York County, January 11, 1933.

*Davis, Polk, Wardwell, Gardiner & Reed*, for the plaintiff.

*Nathan Vidaver*, for the defendants.

La Fetra, Ch. J. This is an action by the plaintiff to recover from the defendants the purchase price of certain stock sold to the plaintiff's ward. The transaction took place early in December, 1927. The plaintiff now claims her ward was insane at the time the contract was made. The contract was made and the stock delivered prior to the appointment of plaintiff as a committee of the person and property of the ward.

Upon the trial plaintiff was produced and testified, in substance, that her ward was extravagant. An eminent psychiatrist was there-

upon called to substantiate the contention of the plaintiff that her ward " was at the time of said purported contract and has since remained incompetent to contract, by reason of lunacy." During the course of his testimony he testified, referring to the ward, *inter alia*, that " she was very much elated, she had a lack of sequels in her ideas, she had ideas which were incompatible with her financial state, she was doing a number of business transactions which seemed unwise. * * * She went into tantrums and was a very difficult person in her behavior." That it was his belief " she was suffering from a mild hypo-mania, that is, a mild mania. People — many people have a rhythm of emotion in which they run into depressions which are apt to alternate with periods of elation. All the best work of the world is done by people in a state of elation, but at times it runs into a completely abnormal and pathological situation." That the characteristics of hypomania were " over-elation, lack of proportion, extravagance, violence of behavior." His testimony on direct examination continued, further: " Q. Was she, in your opinion, at that time, capable of making a contract and knowing what she was doing? A. She could make a contract, she would know perfectly well she was making a contract, if that is the whole of your question. Q. My question is, whether she was capable in your opinion of making a contract and realizing the consequences of what she was doing in that connection? A. Not realizing the consequences, she would know the nature perfectly, but would not be capable of balancing the facts of the contract." And, on cross-examination: " Q. Did I understand you to say, Doctor, that she would understand perfectly the nature of any contract she would enter into but would not realize the full consequences of it? A. I believe so. Q. But she might, mightn't she? A. I wouldn't trust her. Q. What? A. I wouldn't have trusted her. Q. That is, you wouldn't like to have her transact your business for you? A. No. Q. That is about the size of it, isn't it? A. Right. Q. But she would know the nature of any contract she entered into? A. She was quite able to read and understand what she was reading. Q. And quite able to understand what it was about? A. Perfectly. Q. Perfectly? A. But I believe incapable of judging and balancing wisely. Q. Balancing wisely — whom do you know that balances them wisely, name me somebody? A. As wisely — Q. (continuing) That can know when they make a contract that they are going to profit by it? A. As wisely as a normal person and as wisely as I think she would have judged had she been all — Q. (interrupting) Had she not been afflicted with this elation and depression — but, by affliction with those periods of elation or depression, do you mean to say that she

could not enter into a contract under which she might profit? A. Well, she — Q. (interrupting) Well, answer that, won't you? A. Certainly, she might profit by it. Q. She might? A. Yes. * * * Q. But you do know as a natural matter of fact a person suffering in the manner that she suffered at that time could execute a contract, and while it might even be unwise know what she was doing? A. Yes. This lady's mind as against her intellectual faculties was clear enough but she was really suffering in my opinion from an emotional insanity, an emotional insanity, the instrument in her mind was intact enough, she was not a dement, incapable of reading, she was an intellect, she was being driven like a whirlwind by an abnormal emotional drive, and when the emotional drive is abnormal, the intellect does not work as it ordinarily does." Upon redirect examination the following questions were put to the witness and he was allowed to answer without objection: " Q. Your opinions already expressed, Doctor, were founded upon your observation of the patient? A. Certainly. Q. Now, will you tell the jury based upon your entire observations, and having in mind the point Mr. Vidaver has brought out, what your present opinion is as to her condition then, whether she was normal or abnormal? A. I have no doubt whatever that she was abnormal. Q. You have no doubt? A. That she was suffering from an acute — acute mania. Q. Was she competent or incompetent? A. Financially? Q. To manage her affairs? A. Incompetent."

The psychiatrist made his examination of the ward after the making of the contract in question. His testimony is based upon his observations and the mental condition of the patient. There is no evidence connecting this mental condition with her mental condition at the time of making the contract.

After consideration of the testimony adduced upon the trial of this action, I am of the opinion that the evidence fails to show that at the time the contract was made the mind of the ward was so impaired that she was incapable of carrying on her affairs as would a reasonable and sensible woman. (*Aikens* v. *Roberts*, 164 N. Y. Supp. 502, 504.)

Motion to set aside verdict and for a new trial denied. Exception to plaintiff. Ten days' stay of execution, and thirty days to make a case.