[Civ. No. 12326. Second Appellate District, Division Two.—April 11, 1940.]

F. G. KLOKE, Respondent, v. GUS PONGRATZ, Appellant.

F. W. Bahls and Stuart McHaffie for Appellant.

Henry K. Elder and Joseph K. Coady for Respondent.

MOORE, P. J.—This action was brought to recover moneys for services rendered in assisting to procure a lease. It resulted in a judgment by the court in the sum of $13,477.26 against defendant Pongratz who alone prosecutes this appeal.

The grounds of appeal are: (1) The insufficiency of the evidence to support the findings; (2) the limitation upon plaintiff's right of recovery in that any judgment obtained by him would essentially be collectible only out of partnership assets inasmuch as defendant entered into the transaction more than six weeks after plaintiff's employment (Civ. Code, sec. 2411); and (3) lack of proof of ratification or adoption of the contract by Pongratz.

Pongratz was sued as a member of an alleged copartnership, consisting of Main, Coniglio, Hintze and defendant, doing business under the firm name of "California Independent Oil Organization, Unincorporated". The basis of the action was a writing by said Main, dated the 17th day of June, 1933, in the form of a letter addressed to the plaintiff. The instrument is signed "California Independent Oil Organization, Unincorporated, by S. L. Main". It is an offer to pay plaintiff $10,000 cash in two equal payments and to grant him an over-riding royalty of four and one-sixth per cent of the proceeds of all hydrocarbon substances produced and saved from a certain 560-acre tract of tribal lands of the Crow Indians in the Soap Creek oil fields, Big Horn County,

Montana, in the event that the plaintiff should be successful in procuring for said organization a lease of the land.

At the time of the execution of said agreement, the only persons known to the plaintiff to be connected with the said oil organization were Babcock, Main and Hintze. He had never met any of the other parties hereinafter mentioned. He conversed in the Crow dialect and was on friendly terms with a number of the Crow tribe. By reason of his tact in dealing with the red man, plaintiff had undertaken on behalf of other parties prior to 1933 to procure a lease of said tribal lands.

In the spring of 1933, plaintiff had three conferences with the defendants Main, Babcock, and Hintze, at which plaintiff stated that if the lease held by the Argo Oil Company on said lands could be canceled, he could render them an effective service in procuring a lease of said lands. He advised them to use ''California Independent Oil Organization'' as the name of the prospective lessee, by reason of the aversion of said Indians to the major oil companies and of their preference for independent concerns. During the period covered by the ensuing conferences, it was developed that said Argo lease could be canceled and that bids for a new lease would be received on July 28, 1933, at the Crow Indian reservation. At the suggestion of Babcock and the defendant Main, it was determined that the plaintiff should go to Montana. But prior to his departure, at the suggestion of one Weston, plaintiff's employment was memorialized by said letter of June 17th. Otherwise, there is no evidence that any of the members of the so-called organization authorized the execution of said writing. In truth, there is no proof of the existence of any such organization at that time. On the 14th day of July, 1933, plaintiff accepted the terms offered by said Main by affixing his signature at the foot of said letter. On the 20th day of July, he arrived in Hardin, Montana, accompanied by said Main and Weston, his expenses for this trip, as well as of all others, having been advanced by said Main.

On the 28th day of July, 1933, a bid was submitted by said ''California Independent Oil Organization'' for an oil lease on said 560 acres. Accompanying the bid was a list of some fifteen names of persons who were represented to be members of such organization, not including Pongratz. The Indian agent accepted the bid and a deposit by Main subject to the

payment of a bonus of $504 and the posting of a $15,000 bond. Following the filing of said bid, plaintiff visited among the Indians for the purpose of securing favorable action thereon.

On the 15th day of August said bid was approved by vote of the Indians. A draft in the sum of $504 drawn by the Indian agent on said Weston, in payment of said bonus, was dishonored and it was impossible to raise said money from the members of said organization. In his effort to procure said funds, defendant Main made the acquaintance of defendant Pongratz on the 30th day of August, 1933, and on the following day, acting on behalf of himself and "associates" the said Main executed a writing with Pongratz to the effect that, in consideration of the promise of Pongratz to furnish an acceptable surety bond and to pay said sum of $504 and the further sum of $300, the organization would assign to said Pongratz and his associates "an undivided two-thirds of the entire working interest in and to said tribal lease". As a part of said agreement, a corporation should be organized and two-thirds of its capital stock would be issued to Pongratz and one-third to Main and associates. Thereafter Pongratz accompanied by the said Hintze, Main and Coniglio, journeyed to Hardin, Montana, where they arrived on the 6th day of September, when plaintiff for the first time made the acquaintance of Pongratz.

There they were confronted with a new problem. After disclosing to the attorney for the Indians the changes made in their plans by the recent contract with defendant Pongratz, said attorney advised them that in order for them to hold the advantage made by the original bid of the said organization, it would be necessary to submit a new power of attorney bearing the signature of Pongratz. Acting upon said advice of said attorney, on the 6th day of September, 1933, a new instrument was drawn whereby said Main was authorized to bid on behalf of the parties executing the instrument. Said instrument bore the date of July 20, 1933, although it was prepared and acknowledged by Pongratz, Hintze and Coniglio on September 6th. Said instrument recited that Pongratz, Hintze, Coniglio and Main were copartners. Following the delivery of said last-mentioned writing to the Indian agent, Pongratz paid the moneys promised by him in his said contract and posted a $7,000 cash bond which was satisfactory to the department of the interior.

In order to expedite the granting of said lease by the department of the interior, plaintiff, upon the urgent importunities of said Main, accompanied the latter to the District of Columbia, where they arrived on December 25th. Immediately following his arrival in the capital, plaintiff began and continued his work of negotiating with the officials of the department of the interior and of the bureau of Indian affairs and with some legislators with a view of effectuating an immediate grant of said lease. That was soon accomplished. At Main's final act of executing the lease on the 24th day of February, 1934, in Washington, plaintiff for the first time saw said "special power of attorney" of September 6th, which recited that Pongratz, Hintze, Coniglio and Main were copartners. Pongratz knew that plaintiff was with Main in Washington. Upon the execution of the lease, Pongratz promptly organized his "California Independent Oil Organization, Inc." and proceeded with operations upon the lease.

■ Is there substantial evidence tending to support the finding that Pongratz was a copartner with said Main, Hintz and Coniglio? Although the reporter's transcript contains some 850 pages, the following is the only evidence indicating the existence of such copartnership:

(A) The "special power of attorney" executed on September 6th in Montana included the name of Gus Pongratz;

(B) The testimony of Pongratz in his deposition that he became a member of the partnership on July 20, 1933;

(C) The contract of Main and Pongratz on August 31, 1933, and the operation of the lease by the California Independent Oil Organization, Inc., at all times after said February 24th under the management of Pongratz;

(D) (1) The testimony of plaintiff as to the statements of Pongratz to plaintiff at Hardin, Montana, on the occasion of the presentation to Pongratz of a telegram received by plaintiff from the office of Indian affairs complaining of the return of the deposit draft. When Pongratz handed the telegram to Hintze, he said: "He is my attorney and takes care of these matters"; to this Hintz responded: "We will go down and take care of this right away"; and (2) addressing Kloke, said: "Mr. Kloke, all the dealings you have with the California Independent Oil Organization and Mr. Main are OK with us; we will take care of it"; also (3) the introduction

of Pongratz to plaintiff by Main as a "new member" of the organization.

(E) The posting by Pongratz of the $7,000 cash bond with the government to secure the lease.

(F) The presence of Hintze at the first meeting between plaintiff and Main in Babcock's office in the spring of 1933.

In view of plaintiff's contention that Pongratz' conduct estops him from denying the existence of said partnership, we shall first determine whether there was in truth a partnership *inter se*. From a consideration of all of the itemized evidence, singly and collectively, we must conclude that there is no proof of the existence of such partnership.

The fact that said "special power of attorney" bore the date of July 20th does not defeat the fact that it was actually executed on September 6th. The drafting of a new instrument on September 6th to include the name of defendant Pongratz and giving it the date of July 20th was done as a practical expedient to effectuate the substitution of the new power for that which had been used in making the original bid for the lease on July 28th. The act of thus devising another power with Pongratz' name appearing as one of the original bidders for the lease is not an issue here. Plaintiff now seeks to profit by it.

The fact that Pongratz testified in his deposition that on the 20th day of July, 1935, he was a member of the California Independent Oil Association, Unincorporated, does not itself establish the truth of that item of his proof. He later gave corrected testimony which is supported by the indisputable proof that when Pongratz arrived in Montana on September 6th, he received his introduction to plaintiff as a "new member" of the organization. Moreover, the agreement between plaintiff and defendant Main who pretended to represent the organization, became effective July 14, 1933, more than six weeks prior to the time when Main first met Pongratz and seven weeks before plaintiff had ever seen Pongratz.

The fact that the lease was operated by the California Independent Oil Organization, Inc., from the date of the lease on February 24, 1934, till the cessation of operations in April, 1936, under the management of Pongratz, is not proof of such partnership at any time prior to said September 6th, or of Pongratz' membership in any copartnership. When Pongratz was approached by Main August 31, 1933, for the pur-

pose of gaining financial aid to promote the obtaining of a lease, Pongratz definitely avoided a partnership by his written agreement. There is nothing in said instrument from which a partnership may be inferred. It contains no express intention that Pongratz would share the conduct of the business with Main and his associates. No common liability was contemplated. No provision was made for the sharing of profits or losses. It was nothing more than an agreement on the part of Main and his associates to convey to Pongratz a two-thirds working interest in the Indian lease in consideration of the payment by Pongratz of the sums named in the agreement and of the posting of a satisfactory bond with the department of the interior. There is no evidence of any words spoken or acts done by Pongratz at the time of his agreement with Main or at any subsequent conference from which a fair deduction could be drawn that any partnership of Main was to include Pongratz. The agreement was unequivocal and free of all implications that the interests of the two groups were to merge into a copartnership. It is but a fair inference that the phrase ''Main and Associates'' was used for the purpose of distinguishing the members of the California Independent Oil Organization, Unincorporated, as it then existed, from Pongratz and his associates or from any company he might incorporate. It will be recalled that at no meeting with Main prior to September 6, 1933, did plaintiff make any effort to ascertain the identity of the individuals comprising said organization. Promptly upon the execution of a lease by the department of the interior, Pongratz commenced the organization of his said corporation to which was given the name ''California Independent Oil Organization, Inc.'' He thereafter caused two-thirds of its capital stock to be issued to himself and one-third to said Main. It was this corporation that took over the operation of the lease and thereafter continued to develop said lease until April, 1936, when the operations ceased.

Whether the legal relationship of copartners existed in the absence of articles must necessarily depend to a large extent upon their legal intent as deduced from all of the ''transactions, conduct and declarations of the alleged partners''. (*Swanson* v. *Siem,* 124 Cal. App. 519 [12 Pac. (2d) 1053].) A contract of copartnership being similar to any other type of contract must be proved in the same manner by

substantial evidentiary facts. (*Blinn* v. *Ritchie*, 101 Cal. App. 691 [282 Pac. 390].) The only evidence which could be construed as an expression of the relation of copartnership is that found in the said "special power of attorney" and the said admission of Pongratz that he became a member of the organization on July 20, 1933. Both of these are conclusions of law which, taken alone, are insufficient to support a finding of an express partnership agreement. ■ One who alleges a partnership cannot prove it merely by evidence of an agreement wherein the parties call themselves partners. The use of the term "partner" in the popular sense, or as a matter of business convenience will not necessarily import or imply an intention that a legal partnership should result. (47 Cor. Jur. 653, 654.) The *prima facie* showing of the existence of a copartnership must first be made before a person may be charged as a partner by his own declarations. (*Swanson* v. *Siem, supra.*) Excluding said declaration and admission of Pongratz, there is no evidence in the record from which his membership in said copartnership could be rationally inferred.

■ After thus demonstrating a complete absence of any proof of a partnership *inter se*, we turn now to a consideration of plaintiff's proposition that Pongratz is estopped to deny his membership in the copartnership. It is asserted that, by reason of his signing the "special power of attorney" (item A), of his silence in the presence of the plaintiff at the time of the incidents mentioned (item D), and of his silence while knowing of plaintiff's efforts at Washington, he has rendered himself liable as a partner under section 2410 of the Civil Code, which reads as follows: "(1) When a person, by words spoken or written or by conduct, represents himself, or consents to another representing him to anyone, as a partner in an existing partnership or with one or more persons not actual partners, he is liable to any such person to whom such representation has been made, who has, on the faith of such representation given credit to the actual or apparent partnership, and if he has made such representation or consented to its being made in a public manner he is liable to such person, whether the representation has or has not been made or communicated to such person so giving credit by or with the knowledge of the apparent partner making the representation or consenting to its being made."

■ When a partnership by estoppel is claimed, authorities are of little value, except in announcing general principles, for each case must be determined upon its own facts, When, as here, a third party—a stranger to the group alleged to be partners—asserts the partnership, he will not be confined to the same character of proof that would be required of a member. In establishing his case, he may satisfy the trial court that the acts, acquiescences and utterances of a party were such as to warrant his conclusion of a copartnership and that he was justified in his reliance upon such conclusion. (*Associated Piping & Engineering Co., Ltd.,* v. *Jones,* 17 Cal. App. (2d) 107 [61 Pac. (2d) 536].)

Plaintiff having never seen or communicated with Pongratz prior to September 6, 1933, he cannot base his plea of estoppel upon any of his conduct prior thereto. There is no act or acquiescence of Pongratz, on or subsequent to said date, that led plaintiff to continue his efforts to effect the execution of the lease. The only evidence affording any rational basis for the claim that Pongratz represented himself to be a partner in said organization is that set forth in said items A and D. To the significance of item A we have heretofore adverted. The fact that the matters contained under item D were the testimony of plaintiff and were contradicted by Pongratz, Hintze, Main and Coniglio is of ominous significance in view of the crippled condition of the proof advanced to establish an estoppel. This testimony of plaintiff is not of such reliable character as would warrant the finding of a copartnership on the ground of estoppel and is insufficient to hold Pongratz liable as a partner, particularly in view of the failure otherwise to prove that any partnership included him. He could not have relied upon the contents of the "special power of attorney" for he never saw it until after the department of the interior had finally authorized the lease on said February 24th. As to said imputed declaration of Hintze, conceding its verity, it could be considered no more than the exuberant swagger of a promoter beaming on himself after achieving the materialization of his dream. There is no proof that he had any authority to make promises for Pongratz to pay money. His statements merely indicate that his "organization" was delighted with their conquest of a man who could finance the Indian lease.

Moreover, there is no evidence that plaintiff gave any credit upon the faith of such alleged representations. At the beginning of his services, plaintiff dealt only with the defendant Main. He knew no other member of the organization and made no attempt to ascertain any. At no time did plaintiff have any business dealings with Pongratz but dealt solely with Main and his original associates. There is no evidence that would justify the inference that plaintiff placed reliance upon anything more than his contract with Main. Unless he extended his credit or rendered a valuable service in reliance upon the unmistakable representations of Pongratz, he urges in vain his plea of estoppel. Finally, plaintiff's conduct was inconsistent with his asserted belief that Pongratz was a copartner; for, although the contract called for the payment of $5,000 upon the execution of the lease, plaintiff made no demand upon Pongratz for payment until some seven months after the lease had been executed. This is of peculiar significance in view of the fact that in September, 1933, plaintiff made a statement to the effect that Pongratz was the only one connected with the deal who had a good financial standing.

Since there is no substantial evidence to support the finding of Pongratz' membership in Main's organization, either by express agreement or by estoppel, we cannot allow the judgment to stand. In view of the decision indicated, it will be unnecessary to consider the other points raised by the appellant.

The judgment is reversed.

Wood, J., concurred.

McComb, J., deemed himself disqualified and took no part in the consideration or decision of this case.

A petition for a rehearing of this cause was denied by the District Court of Appeal on May 6, 1940, and an application by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 6, 1940. Carter, J., voted for a hearing.