[Civ. No. 15359.   Second Dist., Div. Three.   Dec. 30, 1946.]

THOMAS B. DRUM, Respondent, v. RAYMOND A. BUMMER et al., Appellants.

W. Verne Ahrens for Appellants.

Fleming & Boyce-Smith and J. E. Patterson for Respondent.

WOOD, J.—Plaintiff brought this action for an accounting, to recover possession of certain personal property, and for the conveyance or the purchase price of certain real property in the possession of defendants Raymond and Victoria Bummer, husband and wife. He alleged that said defendants obtained the property from him while he was mentally incapacitated. Judgment was in favor of plaintiff, and defendants appeal therefrom. (By stipulation of the parties, the Bank of America was dismissed as a party defendant upon its depositing with the clerk of the court $1,106.76, the amount of a joint bank account in the names of plaintiff and defendant Raymond Bummer.)

Plaintiff's wife died in March, 1943, at which time plaintiff was 73 years of age. In September, 1943, plaintiff sold his home, which was on 64th Street in Los Angeles, for $6,000, and accepted a trust deed thereon in the sum of $3,200, payable $32 per month. He continued, however, to occupy a room in the house until November, 1943, when he rented a room in the home of one Mrs. Dodson. In December, 1943, he became ill and Mrs. Dodson called Dr. William Walla. Dr. Walla testified that at that time he did not think plaintiff was "right" mentally, and the next day, at the request of Mr. Dodson, Dr. Walla returned and had plaintiff removed to a hospital, and then a few days later had him removed to a sanitarium. Defendants had known plaintiff and his wife for a number of years, and defendant Victoria Bummer had worked for them. Upon learning of plaintiff's plight, the defendants went to the sanitarium on December 31, 1943. Defendant Raymond Bum-

mer went to see plaintiff and, while there, it was decided that plaintiff would come to live with defendants. Defendant Raymond Bummer told Dr. Walla that he was a friend of plaintiff, and Dr. Walla, who testified that at that time he thought plaintiff was in a mild form of senile dementia and needed some good friend or guardian to supervise him and his affairs, released plaintiff into the custody of defendants about January 3, 1944. On that same day, or the next day, defendant Raymond Bummer took plaintiff to the bank where plaintiff had the sum of $3,589.23 on deposit and plaintiff transferred the entire amount to another bank in an account in the names of plaintiff and Raymond Bummer jointly. At the same time plaintiff's safe deposit box was opened and the contents, including a $25 and a $100 savings bond and the trust deed to the property on 64th Street were removed and taken to defendants' home. During the latter part of January, 1944, defendants and plaintiff went to the office of an attorney and defendant Raymond Bummer told the attorney that the parties wished him to prepare a contract which would provide that plaintiff live with defendants for the rest of his life, and in consideration thereof defendants should receive all of plaintiff's property with the exception of the two bonds. On February 2, 1944, the parties returned to the attorney's office and signed the agreement which he had prepared. It provided that defendants should furnish room and board to plaintiff for $50 per month; that Raymond Bummer should not withdraw more than $50 per month from the joint bank account; that plaintiff might withdraw such sums as he might need for his personal expenses; that defendants might terminate the agreement at any time, in which event the $50 monthly payments should be in full satisfaction of all claims against plaintiff; and that in consideration for the continued performance by defendants, plaintiff had made an irrevocable will in which defendants were the sole beneficiaries of his estate, which then consisted of $2,529.25 in money and a trust deed in the principal sum of $2,986.77. The attorney had also prepared the will referred to in the agreement, and plaintiff signed it the same day the agreement was signed. The attorney's fee of $100 was paid from the joint bank account. During February, 1944, Raymond Bummer paid $50 as a down payment on the purchase price of a house and two lots on Springvale Drive, the total price of which was $3,250. The balance of $3,200 was paid from the joint bank account

on February 25, 1944, and a deed to the property was made and recorded in the names of plaintiff and defendants as joint tenants. Thereafter, plaintiff and defendants moved into the house. Defendants caused improvements and repairs to be made which cost approximately $1,200, of which amount $800 was borrowed, and plaintiff and defendants signed a note therefor secured by a trust deed on the property. About January 4, 1945, plaintiff left the Bummer household and rented a room elsewhere. When he left, the defendants had possession of his bank book, bonds, trust deed on the property on 64th Street, and certain baggage belonging to plaintiff. Plaintiff employed an attorney who wrote a letter for plaintiff to the defendants demanding that they deliver to the plaintiff all of his property in their possession, that they render an account, and stating that any contracts between the parties were rescinded. Defendants did not comply with the demand. At the time of the trial they were still occupying the premises on Springvale Drive.

The court found that prior to January 8, 1944, plaintiff suffered a mental and physical breakdown and was mentally incapacitated to transact his own business; that defendants induced plaintiff to sign the purported agreement and will while plaintiff was suffering from senile dementia and not mentally capable of understanding the acts or the legal effect thereof; that the purported agreement "is void for want of consideration, and for want of mutuality, as well as the mental incapacity of plaintiff"; that there was no consideration to plaintiff from defendants for the joint tenancy deed; that all the money placed in the joint bank account was the property of plaintiff; that defendants made certain repairs and improvements on the joint tenancy property which required the expenditure of $1,138.50, $800 of which amount was money belonging to plaintiff; and that defendants received the further sum of $150 from plaintiff without any consideration.

The judgment provided that plaintiff is the sole owner of the real property on Springvale Drive subject to the unpaid balance due on the deed of trust made to secure the note for $800, and ordered defendants to deliver its possession to plaintiff; that plaintiff is entitled to the two savings bonds, and is entitled to possession of the deed of trust executed in his favor by the purchasers of his home on 64th Street; and that defendants are entitled to the sum of $288.50 out of the sum of

$1,106.76 deposited in court, and plaintiff is entitled to the balance of $818.26.

. ■ Appellants contend that the transactions between the parties were valid. The evidence shows that respondent had lapses of memory which grew worse after the death of his wife; that at times he did not recognize his own personal effects, spoke of his wife as though she were living; and had delusions that Mrs. Dodson was his wife. Dr. Walla testified that when he first called upon plaintiff he found him feeble, unable to converse intelligently, and in confusion as to what happened to him days or weeks before. He also testified that altogether he had visited plaintiff about six times; that the last visit was on December 31, 1943, at which time plaintiff's condition was practically the same as it was the first time he saw him; that he considered plaintiff in a senile condition, and that a man does not improve when he is senile; that it had been his experience in such cases that the patient has lucid intervals and at other times he has delusions; and that the patient gets worse as he gets older.

Plaintiff's testimony showed that his memory was hazy, and that he was uncertain as to the time or the happening of events, and as to his own actions. He was not sure when his wife died, and he did not know how long he had lived with defendants. He testified that he did not remember leaving the Dodson home or of entering the sanitarium; that he did not remember being at the sanitarium, but he remembered something about being taken away from there but he did not remember where he was taken; that he remembered talking to Bummer about his bank account, but he did not remember transferring it; that he did not remember talking with defendants about the agreement dated February 2, 1944, or where he was when he signed it; that he did remember Bummer telling him he was going to have an attorney prepare a will for them, and did remember being in the attorney's office.

Defendant Victoria Bummer testified that when plaintiff first came to live with them he was completely worn out and grieved about his wife; and that she (the witness) was "actually scared of him, because he was really run down."

The evidence was sufficient to support the court's finding that plaintiff was suffering from senile dementia at the time he signed the agreement and will. As was stated in the case of *Burgess* v. *Security-First Nat. Bank*, 44 Cal.App.2d 808,

at page 816 [113 P.2d 298]: "A judgment will not be reversed when there is substantial evidence supporting the findings . . . or where different inferences might rationally be drawn therefrom. . . . The same rules apply to the determination of the question of the mental capacity; and the findings of the trial court can be overthrown only when they totally lack the support of substantial evidence."

As stated before, the court also found that defendants had induced plaintiff to enter into the agreement and to make the will, and to place his money in a joint account while plaintiff was incapable of understanding the legal effect of his actions. That this finding is supported by the evidence is sufficiently shown by the following testimony of defendant Raymond Bummer.

He testified that he first "ascertained he [plaintiff] had a bank account" when he (defendant) went to the sanitarium on December 31, 1943; that while he was at the sanitarium he asked plaintiff if it would be all right to transfer the bank account into a joint account; that he asked plaintiff if he felt like the defendant "could do some good and help him out so that I could take care of him and he would like to live with me the rest of his time," and that plaintiff agreed to live with him; that Dr. Walla went to the bank with him and plaintiff when the bank account was changed to a joint account; that Dr. Walla told defendant he thought it was all right to do it since defendant was "trying to be a gentleman"; that the defendant knew plaintiff was in a weakened condition and was forgetful at times; that he did not ask Dr. Walla whether plaintiff was mentally competent to transact business; and that "to tell the truth," there was no discussion with plaintiff about the will. He also testified that he believed he and plaintiff discussed the matter of a will once or twice before going to an attorney; that the defendant probably mentioned the will first—he asked plaintiff if it would be proper to make a will and plaintiff said he didn't see anything wrong with it, but he (defendant) "didn't try to push anything over on him, saying he had to do it"; that defendant told the attorney the will was to provide that defendants receive all of plaintiff's property upon his death; that after the will had been prepared, the attorney read it to plaintiff, and then plaintiff had a chance to read it, and took it in his hands to examine it; that, thereafter, $200 was withdrawn from the joint bank account, $100 of which was used to pay

the attorney for his services, and the balance went to plaintiff—defendant handed it to him. He testified further that plaintiff had the $100 whenever he wanted it, a few dollars at a time; that defendant put it in plaintiff's drawer where plaintiff could get it. He further testified that before the property on Springvale Drive was purchased, he told plaintiff he would like to buy it—that he thought it would make a nice place and plaintiff "would have a place always provided for him," and he told plaintiff if he did not want defendant to use the money defendant could borrow it; that he (defendant) had $50 of his own which he paid down on the property; that he went home and talked about it and plaintiff said it was all right for defendant to use his money, and defendant told plaintiff that he wouldn't lose a dime on it; that defendants and plaintiff went to the bank and withdrew $3,200 from the joint account to pay the balance on the property; that to defendant's knowledge the plaintiff never had any independent advice in any of the transactions between plaintiff and defendant; the defendant probably should have gone some place for some independent advice for plaintiff, but the plaintiff told him it was not necessary and he took plaintiff's word for it; and he guessed the plaintiff had the utmost confidence in him at that time.

The attorney, who prepared the contract and will, testified that all of the parties read the instrument; that he and a law clerk from an adjoining office witnessed the will; that he first introduced the law clerk, and then asked plaintiff if that instrument was his last will, and plaintiff said it was; that he then asked plaintiff if he wished him and the law clerk to sign it as witnesses, and the plaintiff said he did.

The evidence shows that defendants' interest in plaintiff began when they learned he had a bank account; that previous to that time they had not seen him for about nine months, although they had known him approximately seventeen years, knew he was without close friends or relatives, and that he was deeply grieved over the loss of his wife. Furthermore, the invitation to live with them was extended apparently upon the condition that the bank account be made a joint one. Within a period of less than two months after plaintiff went to live with defendants, plaintiff's bank account was transferred to the joint account, the contract and will were made, and the house and lots were purchased and title taken in joint

tenancy. When plaintiff left the Bummers, they had possession of his bank book, bonds, trust deed, and some personal effects and baggage. Defendants had knowledge of plaintiff's mental condition when they took him into their home, and it does not appear that plaintiff refused any of their requests, but that he trusted them and relied upon their advice.

Appellants contend that the contract is binding on plaintiff. In support of that contention they argue, in effect, that plaintiff was never adjudged incompetent, was not without understanding, transacted certain business for himself such as making deposits in the bank, and that the contract was fair and equitable. Plaintiff had not been adjudged incompetent and, it appears, he was not entirely without understanding. In such a case the test to be applied is whether the party was mentally competent to deal with the subject before him with a full understanding of his rights—whether he actually understood the nature, purpose and effect of what he did. (*Maxon* v. *Avery,* 43 Cal.App.2d 155, 157 [110 P.2d 446]; *Carr* v. *Sacramento C. P. Co.,* 35 Cal.App. 439, 442 [179 P. 446].) It was stated in *Jacks* v. *Deering,* 150 Cal. 272, 274 [88 P. 909], regarding a mortgagor's mental soundness, that at the time she executed the promissory note and mortgage she was "then a person of unsound mind, *but was not entirely without understanding,* nor had her incapacity been judicially determined; that at the time of her execution of the said promissory note and mortgage *she did not have sufficient mental capacity to understand the nature, purpose and effect of the transaction* in which she was engaged, or of the promissory note and mortgage. . . ." The trial court herein found that plaintiff was not mentally capable of understanding the acts or the legal effect of the acts in which he was engaged, and that finding is supported by the evidence. Furthermore, it cannot be said that the contract was fair and equitable. Under its provisions, if the arrangement should become tiresome or no longer beneficial to defendants, they could terminate the agreement regardless of the plaintiff's then age, physical, or financial condition. If, on the other hand, plaintiff should become dissatisfied with the transaction, he would have no choice, but would be required to remain with defendants. He was burdened further with the insecurity of his position in not knowing how long defendants would choose to perform the agreement.

The court's finding that defendants gave no consideration for the joint tenancy deed is supported by the evidence.

In view of the foregoing conclusions, it is unnecessary to determine whether the contract was void, for want of mutuality or for any other reason, or to discuss other contentions of appellants.

Appellants assert that plaintiff did not pay for his room and board for the year he was with them, and that, if it was proper for the plaintiff to prevail herein, the *status quo* of the parties should have been restored. The record discloses that, in determining the amount to be awarded defendants, the court considered, among other things, the rental value of the property on Springvale Drive, the number of months defendants had lived there free of charge, the amounts expended by defendants to improve that property, and the down payment of $50 made by defendants. The judgment provided that plaintiff should take the property subject to the $800 trust deed which had been placed thereon in order to pay for the improvements.

The judgment is affirmed.

Desmond, P. J., and Shinn, J., concurred.

A petition for a rehearing was denied January 27, 1947.