[Civ. No. 24865. First Dist., Div. One. June 11, 1968.]

DONALD M. SMALLEY, Plaintiff and Respondent, v. THOMAS E. BAKER, Defendant, Cross-complainant and Appellant; DONALD R. HAILE, Defendant, Cross-defendant and Respondent.

826

Howard S. Dattan for Defendant, Cross-complainant and Appellant.

Barrett, Ferenz, Trapp & Gayle and W. Scott Barrett for Plaintiff and Respondent.

No appearance for Defendant, Cross-defendant and Respondent.

MOLINARI, P. J.—This is an appeal by defendant Baker from a judgment entered in favor of plaintiff Smalley ordering restitution of a $10,000 deposit, together with all accumulated interest, and decreeing rescission of an agreement between Baker, on the one hand, and plaintiffs Smalley and Bratton, on the other, whereby Baker, for the sum of $10,000, licensed Smalley and Bratton to market an axle puller. The case was tried by the court, which entered findings of fact and conclusions of law to the effect that Smalley and Bratton were entitled to rescission on the basis of a material failure of consideration and the mental incompetence of Smalley.[1]

## Facts

In May of 1961, Baker had given to Pendleton Tool Industries, Inc., a California corporation (hereafter referred to as "Pendleton"), a license to make and sell an axle puller invented and patented by Baker. The license was exclusive except that Baker reserved the right to himself to make and sell the device also. In July of 1965, Baker met Smalley for the first time and they discussed Baker's patent. Smalley stated that he was going into a partnership with Bratton and that they were interested in arranging sales of the device to the government.

Since Baker had already granted Pendleton exclusive sales rights on the device, a modification of the 1961 Baker-Pendleton agreement was a necessary prerequisite to a sales arrangement between Baker and other parties. Accordingly, after preliminary negotiations, Baker, Smalley and Bratton entered into the following arrangement: on October 20, 1965, they executed and deposited into escrow with one Haile, a Santa Cruz attorney, three documents, and additionally Smalley deposited the sum of $10,000. The documents were as follows: one, a written license agreement (hereafter referred to as "the contract") signed by Smalley, Bratton and Baker, in which Baker granted Smalley and Bratton a nonexclusive

---

[1]Baker cross-complained against his codefendant, Donald R. Haile, the escrow holder, for the $10,000 deposit. The conclusions of law and judgment do not expressly mention the cross-complaint, but the award to Smalley of the $10,000 deposit clearly disposes unfavorably of Baker's cross-complaint. Under the authority of *Gombos* v. *Ashe*, 158 Cal.App.2d 517, 524 [322 P.2d 933] and *Coronet Credit Corp.* v. *West Thrift Co.*, 244 Cal.App.2d 631, 634 [55 Cal.Rptr. 433], we amend the judgment by including therein an order that Baker is entitled to no relief on his cross-complaint.

right to sell the invention to all the world, and an exclusive right to sell said invention to United States government agencies; two, a proposed modification of the 1961 Baker-Pendleton contract, not yet signed by Pendleton, permitting Baker to license independent contractors to purchase the invention from Pendleton and to market the same; and three, written escrow instructions directing Haile to deliver the $10,000 deposit to Baker upon full execution of the modification of the Baker-Pendleton contract, and further directing Haile to return the deposit to Smalley if Baker did not deliver an executed modification agreement within 90 days. The contract provided that the deposit was to be paid to Baker only on condition that he obtain and deliver to Smalley and Bratton an executed copy of the modification of the Baker-Pendleton contract, and further provided that said modification was subject to the approval of Smalley and Bratton.

Baker took the proposed modification of his 1961 contract with Pendleton to Los Angeles for Pendleton's approval. Pendleton refused to sign the modification, but on October 29 drew up a draft of a substitute modification, which was delivered by Baker's wife to Bratton in Santa Cruz with instructions to bring it back to Los Angeles after it was approved by Smalley and Bratton. Mrs. Baker delivered the document to Bratton on October 30, 1965, when Smalley was not present. Bratton discussed the substituted modification with Smalley, who said that it would be satisfactory with the deletion of four words, which Bratton circled,[2] but that he wanted Haile to see the agreement before it was returned to Los Angeles. Instead of showing the agreement to Haile, Bratton, without Smalley's knowledge, delivered it directly to Mrs. Baker, who took it to Los Angeles for final approval by Pendleton. Pendleton then signed the agreement.

Subsequently there was a metting in Haile's office with Baker, Mr. and Mrs. Smalley and Bratton present. Haile was acting as the attorney for all parties. The modification agreement was discussed, and Smalley said that Mr. Barrett, his

[2] In the copy of the substituted modification that Mrs. Baker brought to Santa Cruz for plaintiffs' approval, there was the following provision: "Licensee [Pendleton] shall not be entitled under the grant of said License Agreement to make contract sales to the United States Government; however, such limitation shall restrict only Licensee itself and shall not in any way restrict sales by those purchasing from Licensee, its distributors, wholesalers, jobbers, or dealers *or by any other person.*" (Italics added.) The italicized phrase constitutes the portion which Smalley wished to delete, and which Bratton circled. Said phrase was deleted from the final modification signed by Pendleton.

attorney, should see the agreement. There was also a meeting in Mr. Barrett's office around November 9, 1965, with the Smalleys, Baker, and Haile present, at which meeting the modification was not discussed.

The original and substituted modification differed as follows: By the original modification Smalley and Bratton would have received under their contract with Baker the nonexclusive right to sell the device to the entire world plus the exclusive right to sell to the United States government, and would have been forced to purchase the device in lots of 1,000 units minimum. Under the substituted modification, plaintiffs got the exclusive right to sell the device to the United States government and they could buy in lots of less than 1,000 units, but they could not sell the device to anyone else.

As to the relationship between Smalley and Bratton, there is no evidence that any formal agreement was ever drawn up between them. There is some evidence that they referred orally to each other as "partners," and intended to form a "partnership," but the agreement between them and Baker referred to them as individuals and made no mention of a partnership. In testifying, Bratton referred to their deal as a business venture. None of the letters between the parties or drafts of agreements that were introduced into evidence made mention of a partnership relation between Smalley and Bratton. Apparently their agreement was that Smalley would supply the $10,000 and get the government contract, whereas Bratton would supply mechanical ability and do all the nongovernmental sales work.

The evidence of Smalley's mental condition was as follows: Smalley was treated for mental illness at a private sanitarium and at Los Angeles County Hospital in 1963, was committed to Camarillo State Hospital on December 13, 1963, was formally discharged in October of 1964, was then rehospitalized in Santa Cruz County Hospital August 12, 1965, and was transferred to Agnews State Hospital on August 21, 1965. On September 2, 1965, he was transferred to Twin Pines Hospital in Belmont, a private psychiatric hospital, and on September 16, 1965, he was discharged to the custody of his wife with the recommendation that he be returned to Agnews. He came under the care of a psychiatrist, Dr. Allison, on November 30, 1965; this doctor was still treating him at the time of trial. Dr. Allison diagnosed Smalley as a manic depressive, which psychosis characteristically causes the patient to be hyperac-

tive, talkative, and unrealistic while in the manic stage. When Dr. Allison first saw Smalley, the latter was in the depressed stage, in which state he would have been able to understand a business contract but would not have wanted to enter into one. According to Dr. Allison, Smalley's records indicated that he began a manic stage around June of 1965, which spontaneously ceased sometime in October 1965. The doctor had no way of knowing whether Smalley was manic or depressed on October 20, 1965, but did know he was manic when he left the hospital on September 16, 1965, and depressed when the doctor first saw him on November 30, 1965. Dr. Allison testified that in the manic stage, Smalley ''might not be able to properly evaluate various types of business conduct.''

Mrs. Smalley testified that the Smalleys moved to Santa Cruz in late June 1965, and that about three weeks thereafter Smalley became hyperactive, entered into many business transactions, and was hospitalized on a police hold for disturbing a place of business. She further testified that his conduct had not changed noticeably by the date of his release from the hospital (September 16) but that around the first part of November he slowed down and became depressed. She testified that Smalley understood what he was doing at the time he got out of the hospital and at that point reinterested himself in the deal with Baker (which he had initiated in July).

Mr. Barrett, Smalley's attorney, testified that he knew Smalley was incompetent and never intended to let him go through with the deal with Baker, but that he and Mrs. Smalley thought it would be good therapy for Smalley to go through the negotiations, and therefore did not tell Baker or Haile that Smalley was incompetent.

Dr. Giese, a psychiatrist, testified that he treated Smalley between August 3 and 12, 1965, and that Smalley was then in the manic phase of his manic-depressive psychosis. Smalley was euphoric, felt that he was invincible, and his judgment of his own behavior and actions was grossly affected. Smalley was not competent to handle simple matters of living in the ward, such as staying where he was supposed to and taking medication. According to Dr. Giese, people with these defects in judgment can come to grief in business transactions because they are unrealistic. In response to the question, how Smalley's psychosis would affect his ability to enter into a business transaction where Smalley bought the privilege of selling a mechanical device to the government under a license

that required considerable sales work on Smalley's part,[3] Dr. Giese replied that if Smalley was anything like what he was when he left the hospital, "his evaluation of the prospects of such a type of business would be colored in exactly the same way by his feelings, his grandiose feelings of his own invincibility."

Bratton was a service station operator who first met Smalley in June of 1965, when Smalley got him interested in the deal with Baker. Bratton testified that Smalley had always seemed perfectly normal and competent to him from the time that they met to at least sometime after Mrs. Baker brought the amended modification back from Los Angeles, except that on one occasion in July of 1965, during a conversation with Bratton, Smalley broke into tears. He also testified that on October 20, 1965, Smalley appeared to understand the nature of the transaction. Smalley himself testified that he thought he knew what he was doing when he entered into the transaction, but also testified that he then felt he "could do anything" and that he was the "greatest salesman going."

Haile testified that there was an initial meeting in his office on October 11, 1965, with Bratton, the Smalleys and Baker, and that Smalley appeared normal and competent. He also thought Smalley appeared normal and competent at all other occasions when Haile saw him, including the meeting of October 20, 1965.

### Contentions

Baker claims that findings 4 and 6 of the court are contrary to law and fact and hence the judgment must be reversed. Finding No. 4 states that Smalley did not consent to the terms of the substituted license modification agreement. Finding No. 6 states that Smalley "did not have the requisite mental competency to enter into a contract at the time he executed the agreements which are the subject matter of this action." Baker concedes that if either of these findings is correct the judgment must stand.

In reply, Smalley asserts that the evidence is conflicting and clearly preponderates in his favor, and hence the appeal is frivolous and taken solely for the purpose of delay. Accordingly, he requests damages under Code of Civil Procedure section 957 providing for damages when it appears to the appellate court that the appeal was made for delay.

[3]Smalley testified that Bratton was to take care of sales under the contract, except that Smalley was to get the government contract.

Our task is to determine whether either of the foregoing findings is sustained by the evidence, and if there is some evidentiary basis for either finding, the judgment must be affirmed. The reason for this conclusion is that first, as to finding No. 6, if Smalley did not have the requisite mental capacity to enter into a contract at the time he executed the instant agreements, then under Civil Code section 39 he is entitled to rescission.[4] Second, as to finding No. 4, if Smalley did not consent to the terms of the substituted license modification agreement, then he is entitled by the terms of the contract and the escrow instructions to the return of the deposit, since the deal is expressly conditioned on approval of the modification agreement by plaintiffs.

### The Finding of Mental Incompetence

In California, as in many states, a party is entitled to rescission of a contract if, when he entered into the contract, he was not mentally competent to deal with the subject before him with a full understanding of his rights, the test being, in each instance, whether he understood the nature, purpose and effect of what he did. (Civ. Code, § 39, as interpreted in *Pomeroy* v. *Collins,* 198 Cal. 46, 69 [243 P. 657] ; *Drum* v. *Bummer,* 77 Cal.App.2d 453, 460 [175 P.2d 879] ; *Stratton* v. *Grant,* 139 Cal.App.2d 814, 817 [294 P.2d 500] ; *Philbrook* v. *Howard,* 157 Cal.App.2d 210, 214 [320 P.2d 609] ; *Peterson* v. *Ellebrecht,* 205 Cal.App.2d 718, 721 [23 Cal.Rptr. 349] ; *Walton* v. *Bank of California,* 218 Cal.App.2d 527, 541 [32 Cal. Rptr. 856] ; *Odorizzi* v. *Bloomfield School Dist.,* 246 Cal.App. 2d 123, 131 [54 Cal.Rptr. 533] ; see generally Weihofen, *Mental Incompetency to Contract or Convey* (1966) 39 So.Cal.L.Rev. 211.) The test is aimed at cognitive capacity and specifically asks the question whether the party understood the transaction which he seeks to avoid. Some contracts require less competence than others, so that the test of understanding varies from one contract to the next. (See *Pomeroy* v. *Collins, supra,* at pp. 68-69; Weihofen, *supra,* at pp. 217-218.)

The traditional test of competence goes to understanding, that is, cognitive capacity, rather than to motivation. (See Note, *Manic-Depressive Held Incompetent to Contract Despite Apparent Ability to Understand Transaction* (1964) 39 N.Y.U.L.Rev. 356, 357.) Accordingly, cases in other jurisdic-

[4]Civil Code section 39 reads as follows: ''A conveyance or other contract of a person of unsound mind, but not entirely without understanding, made before his incapacity has been judicially determined, is subject to rescission, as provided in the chapter on rescission of this code.''

tions have denied rescission to persons entering into contracts while afflicted by psychoses of the manic-depressive type because this particular illness impairs judgment but not understanding. (See *Beale* v. *Gibaud,* 15 F.Supp. 1020, 1026; *Lovell* v. *Keller,* 146 Misc. 100 [261 N.Y.S. 557].) It should be here noted that the manic depressive has alternating moods of euphoria and depression, and that during the euphoric cycle or the excited phase of the illness the imprudent tendencies of the manic may motivate him to enter into ill-advised contracts and thus bring his contractual competence into question.[5] (See 39 N.Y.U.L.Rev., *supra,* at p. 356, fns. 2, 3, and 4 and accompanying text.)

One case has held that a party is entitled to rescission of a contract executed during the manic phase of a manic-depressive psychosis: *Faber* v. *Sweet Style Mfg. Corp.* (1963) 40 Misc.2d 212 [242 N.Y.S.2d 763]. In that case, the court acknowledged that the manic-depressive psychosis does not render a party incompetent under the traditional test of lack of understanding of the transaction, but stated that since this test was developed prior to the recognition of the manic-depressive psychosis as a distinct form of mental illness, it is now appropriate to broaden that test in light of recent psychiatric developments. (*Faber, supra,* at p. 767.) Essentially, the court broadened the test of understanding to a motivational test which may be stated thusly: if, but for the mental illness, the contract would not have been entered into, then the contract is voidable. (For discussion see Weihofen, *supra,* at p. 220; Note, *supra,* 39 N.Y.U.L.Rev. 356.)[6]

Our inquiry, therefore, is whether the *Faber* test is applica-

---

[5]The Law Review Note observes that the syndrome characteristic of the manic phase of a manic-depressive psychosis has been described as follows: ''scarcely deviant from normal 'exuberant' behavior. It is observed that the patient is less restrained than formerly; he is more exhibitionistic, bold, and rash. *Prudence in business and sexual morality are impaired. The patient wastes his money, becomes involved in impulsive activities,* is seductive and sexually promiscuous. His mood is gay and excited. These symptoms are noticeable because they differ markedly from the patient's previous behavior.'' (Note (1964) 39 N.Y.U.L.Rev. 356, quoting Bosselman, Neurosis and Psychosis 81 (1950).

[6]The foregoing Note in 39 N.Y.U.L.Rev. notes an analogy between the extension of the competence test in *Faber* and the broadening of the test of criminal responsibility in *Durham* v. *United States* (1954) 214 F.2d 862, 865 [94 App.D.C. 228, 45 A.L.R.2d 1430]. In *Durham,* it was held that conduct is not criminal if it is the product of a mental disease or disorder; similarly, in *Faber,* it was held that a contract is voidable if entered into as a result of a mental disease. (See 39 N.Y.U.L.Rev. at p. 359.) Thus, both cases have broadened traditional cognitive tests to take account of motivational factors.

ble in California. The author of the foregoing Note in the New York University Law Review observes that the *Faber* case recognized that the traditional standards of contractual competence were developed before psychiatric recognition of the manic-depressive psychosis, which was first recognized as a distinct mental illness in 1896. (See 39 N.Y.U.L.Rev. at p. 357, fn. 10 and accompanying text.) In California, although Civil Code section 39 was enacted in 1872, most of the cases decided under it formulating the test of contractual competency were decided after 1896. (*Pomeroy* v. *Collins, supra,* 198 Cal. 46 was decided in 1926; the case on which it relied, *Carr* v. *Sacramento Clay Products Co.,* 35 Cal.App. 439 [170 P. 446], was decided in 1917; and the earliest case formulating the test of capacity is apparently *Estate of Motz,* 136 Cal. 558 [69 P. 294], decided in 1902, dealing with testamentary capacity.) Moreover, in the intervening years down to the present time, a substantial number of California cases have articulated and applied the cognitive capacity test. (See *Drum* v. *Bummer, supra* (1926) 77 Cal.App.2d 453; *Stratton* v. *Grant, supra* (1956) 139 Cal.App.2d 814; *Philbrook* v. *Howard, supra* (1958) 157 Cal.App.2d 210; *Peterson* v. *Ellebrecht, supra* (1962) 205 Cal.App.2d 718; *Walton* v. *Bank of California, supra* (1963) 218 Cal.App.2d 527; *Odorizzi* v. *Bloomfield School Dist., supra* (1966) 246 Cal.App.2d 123.) There are, however, no California cases dealing with manic-depressive psychosis with respect to contractual incompetency.

 Before proceeding to discuss the law of contractual incompetency applicable in this state to a contract entered into by a manic-depressive psychotic, we note that the Legislature has categorized incompetency due to weakness of mind as follows: (1) Total weakness of mind which leaves a person entirely without understanding and renders such person incapable of making a contract of any kind (Civ. Code, § 38); (2) a lesser weakness of mind which does not leave a person entirely without understanding but destroys the capacity of the person to make a contract, thus rendering the contract subject to rescission (Civ. Code, § 39); and (3) a still lesser weakness which provides sufficient grounds to rescind a contract because of undue influence. (Civ. Code, § 1575; see *Odorizzi* v. *Bloomfield School Dist., supra,* 246 Cal.App.2d at p. 131.) The last mentioned statute, in subdivision 2 thereof, provides that undue influence consits "In taking an unfair advantage of another's weakness of mind. . . ." In *Odorizzi* it is noted that the lesser weakness of mind referred to in

section 1575 need not be long lasting or wholly incapacitating, but may consist of such factors as lack of full vigor due to age, physical condition, emotional anguish, or a combination of such factors. (P. 131.) It would appear, therefore, that since the manic-depressive psychosis is a mental illness it is clearly a weakness of mind in the context of Civil Code section 1575.

The manic phase of the illness under discussion is not, however, a weakness of mind rendering a person incompetent to contract within the meaning of Civil Code sections 38 and 39. These sections exclude the manic-depressive psychosis by their very language since they make specific reference to the person's *"understanding."* This language, as interpreted by the decisions, establishes the "understanding" or cognitive test as the prevailing standard of legal competency. As already pointed out, the cognitive test deals with the mental capacity to understand the nature and purpose and effect of the transaction and not with the motivation for entering into it. The manic phase of the manic-depressive psychosis does not impair such understanding, but only relates to the motivation. Notwithstanding the long-standing psychiatric recognition of such psychosis the Legislature has not, in its wisdom, seen fit to broaden section 39 so as to include within its ambit the motivational standard of incompetency. We may not merely speculate that the Legislature has been oblivious of psychiatric developments. It should be apparent that the Legislature must be aware of the conflict posed by the desire to protect the manic, on the one hand, and on the other hand, the desire to safeguard the manic's right freely to contract and the stability and security of business transactions. An important consideration is that the motivational test may be used by both the manic and the person with whom he has contracted as a pretext to escape from a bad bargain or to avoid a bargain which has not come up to expectations.

In the present case all the evidence shows that Smalley did have the capacity to understand what he was doing. Smalley, Mrs. Smalley, and Bratton all testified to this effect. The testimony of the psychiatrists was not to the contrary, the essence of their testimony in this regard being that Smalley's judgment was affected. This syndrome is characteristic of the manic phase of the manic-depressive psychosis, but, as previously noted, does not go to the subject's powers of understanding. In short, under the traditional test of

competence set out in Civil Code section 39, Smalley was not incompetent to enter into a contract.

In this case the court found that there was no evidence of fraud. Not only is the record devoid of any evidence of fraud, but there is no evidence of unfairness, overreaching or undue influence. There is no claim or showing that Baker knew or was aware of Smalley's mental illness, or that he took advantage of such illness so as to bring Civil Code section 1575 into play. We, therefore, conclude that the finding that Smalley did not have the requisite mental capacity to enter into the agreements which are the subject of this action is not supported by the evidence.

### Consent to the Substituted Modification

The court's finding that Smalley did not consent to the modification agreement that Mrs. Baker brought to Bratton implies a factual finding that Smalley did not personally approve that modification. There is evidence in the record to support such a finding, namely, the evidence that Smalley wanted Haile to see the modification before it was approved and that Bratton in violation of Smalley's instructions sent the modification back to Baker with the implicit assurance that both plaintiffs had approved said modification. In light of the well-known rule that the evidence must be construed in support of the findings and judgment, defendant clearly cannot argue at the appeal stage that we should reweigh the evidence; rather, since there is some evidence that Smalley did not approve the modification, we are bound to accept the trial court's resolution of this factual question.

Baker concedes that if Bratton and Smalley were not partners or joint venturers, then there was no consent by Smalley to the modification. He argues, however, that the record discloses that as a matter of law Bratton and Smalley were either partners or joint venturers and that, accordingly, Smalley consented to the modification in that Bratton had authority to approve said modification on Smalley's behalf. Essentially, Baker relies on Corporations Code section 15009, which provides, in pertinent part, that unless a person dealing with a partner has knowledge that such partner has no authority to act or has knowledge of any restrictions on such partner's authority, the act of such a partner purporting to act for the partnership binds the partnership.[7] (See *Deicher*

---

[7] Corporations Code section 15009 provides: "(1) Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any

v. *Corkery*, 205 Cal.App.2d 654, 662 [23 Cal.Rptr. 270].) Baker argues that Bratton and Smalley had formed a partnership, and that either Bratton had authority to act for the partnership in the approval of the modification of the agreement, or alternatively, Baker had no knowledge of any restrictions on Bratton's authority to bind the partnership to this matter.

▇ As to a joint venture, the rule has been fairly well established that each joint venturer has authority to bind the others in making contracts reasonably necessary to carry out the enterprise (*Lindner* v. *Friednash*, 160 Cal.App.2d 511, 517 [325 P.2d 612] ; *Block* v. *D. W. Nickolson Corp.*, 77 Cal.App. 2d 739, 744-745 [176 P.2d 739]), which authority may be oral or implied from the circumstances (*Foote* v. *Posey*, 164 Cal. App.2d 210, 217 [330 P.2d 651]). A few cases have opined that in certain joint ventures one adventurer may not have the power to bind the other. (*Keyes* v. *Nims*, 43 Cal.App. 1, 9 [184 P. 695] ; *Stilwell* v. *Trutanich*, 178 Cal.App.2d 614, 619 [3 Cal.Rptr. 285] ; *Nels E. Nelson, Inc.* v. *Tarman*, 163 Cal. App.2d 714, 726 [329 P.2d 953].) These cases appear, however, to rest on the factual situations therein which involved ventures of a limited scope. (See 3 Witkin, Summary of Cal. Law (1960) Partnership, § 12.) ▇ There is no evidence whatsoever in the record that Baker, while in Los Angeles, knew or could possibly have known of any limitations placed by Smalley on Bratton's authority to approve the modification. Accordingly, if Smalley and Bratton were indeed partners or joint venturers, Bratton, as a matter of law, had the authority to consent to the modification on Smalley's behalf.

The court did not, however, expressly find that Smalley and Bratton were engaged in either a partnership or a joint venture. The record indicates that this issue was not argued by counsel, but considerable evidence of the relationship between Bratton and Smalley was adduced at the trial. ▇ The question of whether a partnership or a joint venture existed is one of fact, to be resolved by the trier of fact from the objective circumstances surrounding the transaction, such as the parties' agreement and their conduct. (As to

instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority. . . . (4) No act of a partner in contravention of a restriction on authority shall bind the partnership to persons having knowledge of the restriction.''

partnerships, see, e.g., *Gardiner* v. *Gaither*, 162 Cal.App.2d 607, 615 [329 P.2d 22]; *Mercado* v. *Hoefler*, 190 Cal.App.2d 12, 16-17 [11 Cal.Rptr. 787]; as to joint ventures, see, e.g., *Nels E. Nelsan, Inc.* v. *Tarman, supra*, 163 Cal.App.2d at p. 725; *Goldberg* v. *Paramount Oil Co.*, 143 Cal.App.2d 215, 220 [300 P.2d 329]; *Boyd* v. *Bevilacqua*, 247 Cal.App.2d 272, 285 [55 Cal.Rptr. 610].) ▮▮▮ In this case, the fact that plaintiffs referred to each other as "partners" does not compel the finding that they were involved in either a partnership or a joint venture (see, e.g., *Kloke* v. *Pongratz*, 38 Cal.App.2d 395, 402 [101 P.2d 522]), nor, on the other hand, does the fact that there was no formal or written agreement between them compel the opposite conclusion that there was no partnership or joint venture. (See, e.g., *Calada Materials Co.* v. *Collins*, 184 Cal.App.2d 250, 253 [7 Cal.Rptr. 374].) ▮▮▮ In this area, the determination is essentially a factual one, and the finding of the trial court will be affirmed if supported by substantial evidence. (*Kersch* v. *Taber*, 67 Cal.App.2d 499, 504 [154 P.2d 934]; *Smith* v. *Grove*, 47 Cal.App.2d 456, 461 [118 P.2d 324].) Here, however, there is no express finding on the issue.

▮▮▮ The familiar rule is that in the absence of a request for specific findings, we must imply in support of the judgment all reasonably necessary factual findings that may be inferred from the findings actually made. (*Auer* v. *Frank*, 227 Cal.App.2d 396, 406 [38 Cal.Rptr. 684, 8 A.L.R.3d 1108].) ▮▮▮ Here, the court's ultimate finding that Smalley did not consent to the modification agreement implies one of two factual determinations: either that Smalley and Bratton were neither partners nor joint venturers and Smalley's separate consent to the modification was required; or, that there was a partnership or joint venture but Smalley did not authorize Bratton to approve the modification and Baker knew of this lack of authority. As discussed, the evidence does not support the latter theory. ▮▮▮ The former theory, however, that Smalley and Bratton were neither partners nor joint venturers, is supported by the following evidence: there was no formal agreement between Smalley and Bratton; their acquaintance was brief; while Smalley put up $10,000, Bratton at the time the instant dispute arose had not yet contributed anything of value to the venture; and Smalley appeared to be the motivating force behind the deal and the person who initiated the transaction and directed its development. In short, the ultimate finding of the court, that Smalley did not

consent to the modification, is supported by an inferred finding that there was no joint venture or partnership, which finding in turn is supported by the evidence. Our conclusion that the evidence supports a finding that there was no partnership or joint venture is given additional support by the rule that in the absence of a written agreement, the burden of proving the existence of a partnership is on the party so alleging (*Mercado* v. *Hoefler, supra,* 190 Cal.App.2d at p. 16; *Frisch* v. *Frisch,* 97 Cal.App.2d 183, 185 [217 P.2d 150]), and the proof must be clear and convincing. (*Sullivan* v. *Schellinger,* 170 Cal.App.2d 111, 113 [338 P.2d 462].)

 We conclude that the evidence supports the court's finding that Smalley did not consent to the substituted modification agreement, and that this finding in turn supports the judgment of rescission and restitution to Smalley of the $10,000 deposit. In view of this conclusion we need not consider Smalley's contention that under Civil Code section 1698 a written contract may only be altered by another contract in writing or by an executed oral agreement. Suffice it to say, we are not dealing with a question involving the modification of a written contract but with a license agreement that was expressly conditioned upon the approval of a modification of the Baker-Pendleton contract. Such approval did not take place. Accordingly, the condition precedent of the written contract between Smalley and Bratton on the one hand and Baker on the other hand was never satisfied. Therefore, under the terms of the escrow instructions Smalley was entitled to a return of the deposit when the contract did not go into effect within 90 days after October 20, 1965.

### Frivolous Appeal

 In the light of the foregoing it should be clear that the instant appeal raises important questions of partnership and contract law, as well as a question of first impression regarding the capacity to contract. Accordingly, the claim that the appeal is frivolous is unwarranted and is itself frivolous.

The judgment, as amended to include therein an order that cross-complainant Baker is entitled to no relief on his cross-complaint against Donald R. Haile, is affirmed with directions to the trial court to amend the findings of fact to conform with the views herein expressed.

Sims, J., and Elkington, J., concurred.